**FOR CHILDREN, INC., Plaintiff,**

v.

**GRAPHICS INTERNATIONAL, INC., Defendant.**

**No. 67 Civ. 549.**

United States District Court,
S. D. New York.

Dec. 29, 1972.

Sandoe, Hopgood & Calimafde, New York City, for plaintiff; John M. Calimafde, Arthur M. Lieberman, New York City, Richard H. G. Cunningham, Stamford, Conn., of counsel.

Weil, Gotshal & Manges, New York City, for defendant; Michael K. Stanton, Arthur F. Abelman, New York City, of counsel.

EDWARD WEINFELD, District Judge.

Plaintiff, For Children, Inc., was formed in February 1966 to engage in the business of publishing and marketing children's books. The defendant, Graphics International, Inc., is a printer whose activities include production of pop-up items. Jurisdiction is based upon diverse citizenship;[1] the plaintiff is an Ohio corporation and the defendant a California corporation with its principal place of business in New York City; accordingly, New York law is applicable to their controversy.

Plaintiff's president, late in 1965 and prior to its formation, conceived the idea of a book for children, the principal feature of which was a three-dimensional pop-up together with story material of a single subject.[2] The books, intended for young children under twelve, were to be sold through magazine distribution techniques in mass retail outlets, such as supermarkets, discount houses and chain stores, involving, if successful, reprints; the first printing was to be of three titles, with additional titles planned as the venture progressed.

After a series of conferences between plaintiff's president and defendant's president, the plaintiff, on April 25, 1966, placed an order with the defendant for the production and printing of 758,333 children's pop-up books at a total cost of $57,809.56, which included art work, pop-up design and display boxes. The books were three in number, entitled: (1) "Our Man on the Moon," with a space ship pop-up; (2) "Pets," with a pet pop-up; and (3) "Wake Up in Paris," with an Eiffel Tower pop-up. The three books were to be packed in a single display carton containing three trays or rows, each row to contain thirty books of a single title. The order, which defendant accepted in writing, and constitutes the agreement between the parties, required the defendant to submit first color proofs to plaintiff for its approval. Such proofs were submitted to plaintiff on June 7, 1966, which found them excellent and gave its approval in writing to the defendant, who then proceeded with production.

The defendant had arranged that the printing be done in Japan by a Japanese firm and, under trade agreements between our government and Japan, the issuance of an irrevocable letter of credit or cash in advance was required. A letter of credit was duly issued in favor of defendant covering the cost of the order.

On July 7, 1966, defendant submitted to plaintiff approximately a dozen three-pack units (containing approximately 1,080 books) from the first production run. These were examined by plaintiff's president in the presence of a representative of defendant who had delivered them. Various defects appeared in the books themselves, as well as in the display cases. Among other defects, out of a total of 330 "Wake Up in Paris" books, 60% failed to pop up or did not pop up totally, so that they were at an angle; others were pinched and had to be hand manipulated to get them to an upright "pop-up" position. The defendant was advised of the deficiencies by letter dated July 8. The defendant did not deny the claimed defects; it responded: "We have gone over in detail with Japan all of the nine points listed in your letter, and feel certain that they will be corrected."[3] Apart from the foregoing, plaintiff was also assured the

---

1. 28 U.S.C. § 1332.

2. As the cover of the book is opened, an item pops up which is related to the theme of the book.

3. Plaintiff's Exhibit 1L.

finished product would conform to the approved proofs.

On or about August 4 defendant delivered to plaintiff eighty-four three-packs,[4] part of the new run of production which had just arrived from Japan. A substantial portion of this shipment was examined in the presence of two representatives of the defendant. Of a total of 720 "Wake Up in Paris" pop-ups that were examined, 260, or 36%, were found to be imperfect or defective in that, as one witness put it, "it did not pop up" or otherwise malfunctioned.

As a result of the August 4th inspection the defendant wrote to the plaintiff stating, among other matters, that it was "reprinting the Paris pop-up book, so that the incidents of mechanical failure are less likely to occur."[5] It added that because of its inherent nature, "it is virtually impossible to make [the pop-ups] 100% mechanically perfect, but will do our best." Further, defendant expressed its view that "if 85% – 90% of the pop-ups work correctly, this should be an acceptable standard due to their complexity"—a contention which plaintiff challenges. It insists under the agreement it was entitled to books that conformed to the color proofs it had approved before production commenced.

The defendant next made delivery to plaintiff early in September of a total of 550,320 books. With respect to this delivery, approximately 75,000 to 80,000 were individually examined, and of those 63% of the "Paris" books malfunctioned in that they did not pop up; some were bent and had to be hand manipulated to get a full pop-up; some were torn; others would not open because of an overflow of glue. About 51% of the "Man on the Moon" books that were examined malfunctioned. On October 3 plaintiff notified defendant that the percentage of the defective pop-ups rendered the entire shipment unmarketable, and of its rejection of the entire order. It demanded the return of $42,754.20, the amount that had been paid to that date, and other damages it claimed.

There can be no issue that a substantial portion of the shipment, principally the "Paris" books, malfunctioned in one or more respects. The defendant's position is that the nature of the pop-up and its construction did not permit 100% compliance with the first color samples approved by plaintiff; that a tolerance or leeway of imperfection up to 15% of books delivered satisfied the terms of their agreement. When plaintiff made its inspection of the September shipment and complained that a substantial number of the books, particularly those with the "Eiffel Tower" pop-ups, were defective, the defendant, on September 14, 1966, offered to correct "[the] pinched condition whenever it occurs in these pop-up books," but added, "we cannot guarantee the longevity of this repair above 90%."[6] However, the defendant conditioned its offer on plaintiff extending the letter of credit for the balance of the initial order, some 230,000 books then held by defendant in Japan. Plaintiff's position was that the defect was not confined to a pinched condition; that a substantial number of the books just did not pop up properly and rejected the offer,[7] and the efforts of the parties otherwise to adjust their differences having failed, this suit followed. The defendant asserted a counterclaim seeking payment for the balance of the books not yet delivered.

The mechanical design and structuring of the pop-up and the paper engineering was the responsibility of the defendant; its expertise as a pop-up printer and designer was relied upon by plaintiff in placing the order with the defendant. During the course of their negotiations, the defendant never suggested a margin of error in performance, either 15% or any percentage of the

---

4. Each three-pack contained 90 books, 30 of each title; each master container had 540 books.

5. Plaintiff's Exhibit 17.

6. Defendant's Exhibit G.

7. Plaintiff also took the position it had no assurance that books in future deliveries would not have the same defects.

books it produced. The contract contains no such reference. It does provide for approval of the first color proof by plaintiff and nothing is contained therein, either explicitly or implicity, that 85% performance would satisfy the standard so approved. Defendant's president testified that in the discussions that preceded placement of the order he never said he would deliver 100% perfect pop-ups; however, neither did he say he would not deliver 100% perfect pop-ups. He did testify that he believed that the pop-ups would substantially conform to the proofs. Moreover, it is significant that with respect to the irrevocable letter of credit which was in the nature of advance payment, the defendant, on June 8, one day after plaintiff had approved the color samples, assured plaintiff that payment did not constitute acceptance and that plaintiff would have full recourse against defendant "if the product does not meet the standards which have been agreed upon in advance." [8] The only standard agreed upon was the first color proofs. The suggested margin of nonperformance was first advanced after plaintiff found defects in the books contained in the eighty-four three-packs of the new production run delivered in early August 1966; thereafter, when plaintiff found malfunctioning in a substantial percentage of the September deliveries, defendant took the same position as against plaintiff's view that it was entitled to have all books conform to the approved color proofs.

I find plaintiff under its order was entitled to have books delivered in accordance with the approved proofs; that defendant failed to deliver books in accordance therewith; that a substantial portion of the books delivered were imperfect and malfunctioned and were not marketable; that since this was plaintiff's initial attempt to enter the children's book market through retail distribution techniques, none of the books, including those which were free from defects, were marketable; in sum, that defendant breached its agreement. Moreover, even accepting defendant's standard of performance with respect to the "Paris" and "Moon" pop-ups, it failed to come within its own alleged permissible margin of variance.

There remains the question of damages to be awarded to the plaintiff for defendant's breach of the contract. Each side advances conflicting theories as to the proper measure of damages. Plaintiff conceptualizes a theory which, if accepted, would require the defendant to pay not only the damages which normally and directly flowed from its breach, but in addition, to assume the capital financing of plaintiff's business as a new venture, which clearly was not within their contemplation.[9] The defendant, on the other hand, advances a theory, based upon a claim that the initial venture was destined to be a losing proposition which, if accepted, would result in no award of damages to plaintiff.

I reject both theories as unrealistic and without legal support. The nature of the transaction must be considered. Plaintiff urges the transaction was a sale by sample because the agreement required approval of the first color proofs; consequently, it contends the damages are governed by the Uniform Commercial Code, which would give some support to its theory of damages.[10] However, the facts do not support plaintiff's position; essentially the contract was for the work, labor and services of the defendant, principally printing the pop-up books and supplying the materials, including display stands so that the books would be ready for marketing.[11] The defendant's

8. Plaintiff's Exhibit 1G.

9. Cf. Rochester Lantern Co. v. Stiles & Parker Press Co., 135 N.Y. 209, 217–218, 31 N.E. 1018, 1021–1022 (1892); see also Armstrong Rubber Co. v. Griffith, 43 F.2d 689, 690 (2d Cir. 1930).

10. See N.Y.U.C.C. §§ 2–711, –715 (McKinney 1964).

11. See In re North American Leisure Corp., 468 F.2d 695 (2d Cir., 1972); Platt & Munk Co. v. Republic Graphics, Inc., 218 F.Supp. 262 (S.D.N.Y.1962), aff'd as modified, 315 F.2d 847 (2d Cir. 1963); Wm. H. Wise & Co. v. Rand McNally & Co., 195 F.Supp. 621 (S.D. N.Y.1961); cf. Ben Constr. Corp. v.

theory, on the other hand, fails to consider that not all of the expenditures made by plaintiff during the period in question were attributable directly to the marketing of this first order of books. A portion of the monies disbursed were for general expenses and were calculated to benefit the plaintiff corporation in its later marketing ventures.[12] Consequently, if the damages are to be based upon net profit, an appropriate allocation must be made of these items.

■ The contemplation of the parties was that the entire order would be sold to the public. It is realistic upon this record to recognize that the pop-ups could not readily be produced by another printer in this limited field of pop-up printing, and thereby marketed as contemplated and the defendant charged with the increased cost, if any, of printing and production. Absent such a yardstick, ascertainment of the damages are difficult of precise determination. However, this uncertainty does not mean that plaintiff is to be deprived of a recovery; to do so would permit a person who has breached his agreement to escape liability. The law will not tolerate such a result; instead it seeks to award to the injured party reasonable damages naturally flowing from the breach.[13] To achieve that result, different circumstances call for different measures to be applied.[14]

■ In the circumstances of this case the court is of the view that the loss of prospective profits, the direct and proximate result of the breach, should be the measure of damages. While it is true that plaintiff's enterprise was a new venture and that as a general rule loss of profits in the interruption of such a venture, in distinction to an existing and going business, is not allowed,[15] there is evidence in this case upon which such an award can be made;[16] moreover, such a measure of damages is less uncertain

Ventre, 23 A.D.2d 44, 257 N.Y.S.2d 988 (4th Dep't 1965). This conclusion is not altered by the facts that (1) plaintiff's books employed minimal editorial material and a pop-up, cf. Platt & Munk Co., supra, or (2) that the contract was in the form of a purchase order, see Wm. H. Wise & Co., supra, 195 F.Supp. at 626 n. 5.

12. Plaintiff's president testified that the corporation later marketed books similar in theme to those in issue, but with expanded editorial material and without pop-ups.

13. Cf. Randall-Smith, Inc. v. 43rd St. Estates Corp., 17 N.Y.2d 99, 106, 268 N.Y.S.2d 306, 312, 215 N.E.2d 494, 498 (1966); Wakeman v. Wheeler & Wilson Mfg. Co., 101 N.Y. 205, 209, 4 N.E. 264, 266 (1886).

14. Cf. Haughey v. Belmont Quadrangle Drilling Corp., 284 N.Y. 136, 142, 29 N.E. 2d 649, 652 (1940), remittitur amended, 286 N.Y. 584, 35 N.E.2d 931 (1941); Orester v. Dayton Rubber Mfg. Co., 228 N.Y. 134, 138, 126 N.E. 510, 512 (1920); Dillon v. Magner, 29 A.D.2d 759, 760, 287 N.Y.S.2d 519, 521 (2d Dep't 1968); New York Water Serv. Corp. v. City of New York, 4 A.D.2d 209, 213, 163 N.Y.S.2d 538, 542 (1st Dep't 1957); see also Eastman Kodak Co. v. Southern Photo Materials Co., 273 U.S. 359, 47 S.Ct. 400, 71 L.Ed. 684 (1927); Clements Auto Co. v. Service Bur. Corp., 444 F.2d 169, 190

(8th Cir. 1971); Distillers Distrib. Corp. v. J. C. Millett Co., 310 F.2d 162, 165 (9th Cir. 1962) (interpreting California law); Harry Alter Co. v. Chrysler Corp., 285 F.2d 903, 907 (7th Cir. 1960).

15. Cf. Cramer v. Grand Rapids Show Case Co., 223 N.Y. 63, 119 N.E. 227 (1918).

16. Courts have often recognized that if profits were in the contemplation of the parties and there is shown some rational basis for determining such profits, they may be recovered as damages. See, e. g., Gasoline Prods. Co. v. Champlin Ref. Co., 39 F.2d 521, 522 (1st Cir. 1930), rev'd on other grounds, 283 U.S. 494, 51 S.Ct. 513, 75 L.Ed. 1188 (1931); Czarnikow-Rionda Co. v. Federal Sugar Ref. Co., 255 N.Y. 33, 173 N.E. 913 (1930); cf. Eastman Kodak Co. v. Southern Photo Materials Co., 273 U.S. 359, 378–379, 47 S.Ct. 400, 71 L.Ed. 684 (1927); 342 Holding Corp. v. Carlyle Constr. Corp., 31 A.D.2d 605, 295 N.Y.S.2d 248 (1st Dep't 1968); Ornstein & Sons Watch Case Co. v. Dantzig, 28 Misc.2d 505, 208 N.Y.S. 2d 99 (App.T.1960). In the case at bar, profits derived from sale of the books were within the contemplation of the parties. The defendant had been fully informed of not only plaintiff's proposed resale of the books supplied, but also of plaintiff's entire marketing scheme and the importance of delivering the full order on time and in

and conjectural than other proposed yardsticks of damage.[17] The new venture was in readiness to market the books, but plaintiff was prevented from doing so by the defendant's breach; substantial orders were received prior to the October 3rd rejection and the sales promotion program indicates the probability of the successful distribution of a substantial part of the entire order.[18] Taking into account the unrestricted right of return of books by distributors, a reasonable probability is that plaintiff would have sold 75% of the books. Accordingly, it is entitled to the gross profits on such prospective sales less the expenses properly chargeable to the project.[19]

Plaintiff had arranged to sell to distributors cartons containing 90 pop-up books for $17.50 per carton, less an incentive payment of $1,[20] or a net price to it per carton of $16.50. In all, there were 8,333 cartons available for sale, 75% of which total 6,250 cartons. At $16.50, plaintiff would have received a gross sum of $103,125. From this sum must be deducted $57,809.56, the cost under the contract. Other production costs, including art work, typesetting, freight and the charge for the letter of credit, totalled $7,198.56. Additionally, there were indirect costs such as salaries, travel and office expenses incurred in launching plaintiff's venture, which amount to $42,504.34. But since this was to be an ongoing business, with the production of additional books, not all of this should be deducted from the gross profit to reach net profit.[21] While no evidence has been offered as to allocation, the court may apply its experience [22] and concludes that with respect to the marketing of the books at issue a fair allocation, since this was a new undertaking, is 75%, or $31,878.25.[23]

■ Plaintiff is entitled to reimbursement for expenses necessarily and reasonably incurred by reason of the defendant's breach. These include the sorting of the books upon delivery to decide their marketability, $750; handling and transporting books to the place of inspection and back to the warehouse, $314.25;[24] and warehouse storage charges at $150 per month.[25] As to storage, plaintiff here seeks reimbursement at that rate to the date of trial, December 1972. However, that would be unreasonable. As already noted, following the September 1966 delivery of more than 500,000 books, the parties failed to resolve their differences. Plaintiff then stored the books in a ware-

---

acceptable working condition. In addition, as already found by the court, plaintiff was fully relying upon defendant's expertise in the pop-up field.

17. *Cf.* Wakeman v. Wheeler & Wilson Mfg. Co., 101 N.Y. 205, 209, 4 N.E. 264, 266 (1886).

18. Defendant claims that the evidence shows plaintiff had by July 1966 decided to alter its marketing scheme and enter the educational market. *See* Plaintiff's Exhibit 1B. However, the evidence contradicts any contention that the plaintiff had abandoned its original plan of distribution through retail outlets. The plan was merely expanded to include placement by local distributors (as opposed to a national distributor) in schools as well as retail outlets. *See* Plaintiff's Exhibits 29–36, 39.

19. *Cf.* Orester v. Dayton Rubber Mfg. Co., 228 N.Y. 134, 138–139, 126 N.E. 510, 512 (1920); Readex Microprint Corp.

v. General Aniline & Film Corp., 74 N.Y. S.2d 613 (Sup.Ct.1947).

20. *See* Plaintiff's Exhibits 29–36, 39.

21. *Cf.* Transit Advertisers, Inc. v. New York, N. H. & H. R. R., 194 F.2d 907, 911–912 (2d Cir.), cert. denied, 344 U.S. 817, 73 S.Ct. 11, 97 L.Ed. 636 (1952).

22. *See* Wakeman v. Wheeler & Wilson Mfg. Co., 101 N.Y. 205, 217, 4 N.E. 264, 271 (1886).

23. Of course, additional expense would be incurred in order to market the entire order. The court is satisfied that any such cost is adequately reflected in the allocation for indirect expenses.

24. *See* Plaintiff's Exhibit 22. The estimated cost per day was $104.75. The inspection lasted three days.

25. *Cf.* Taylor v. Saxe, 134 N.Y. 67, 31 N.E. 258 (1892). *Compare* N.Y.U.C.C. §§ 2–604, –711(3), –715(1) (McKinney 1964).

house, where they remain to this day. The defendant stored the balance of the order, approximately 230,000 books, in a warehouse in Japan until about one year ago when they were destroyed. Thus, the entire subject matter of the contract gathered dust and accumulated substantial storage charges from October 1966, while this litigation, instituted by plaintiff in February 1967, wended its way through extensive pretrial discovery procedure until the trial was concluded in December 1972. During this six-year period, experienced businessmen and their competent counsel took no practical steps (without prejudice to their respective positions) to reduce the losses to the extent that any of the good books might have been salvageable, no matter who had to bear the ultimate loss. Once plaintiff rejected the shipment in October 1966 as not in accord with the contract, it should have required defendant to call for and remove the books within a reasonable time, failing which it would have been justified in disposing of them instead of accumulating storage charges indefinitely, thus far for six years. I hold that at most it should have disposed of them within three months and storage charges will be allowed in that amount, or a total of $450. To recapitulate:

| | | | |
|---|---:|---:|---:|
| Receipts upon sale of books (75%) to distributors: | | | $103,125.00 |
| Payment due under contract | $57,809.56 | | |
| Less sum previously paid by plaintiff: | 43,834.20 | | |
| | | $13,975.36 | |
| Art work, typesetting and freight: | | 7,071.19 | |
| Salaries, travelling and office expenses: | | 31,878.25 | |
| Charge for letter of credit: | | 127.37 | |
| | | | 53,052.17 |
| | | | $ 50,072.83 |
| Additional expenses incurred by defendant's breach: | | | |
| Sorting and inspecting: | | $ 750.00 | |
| Handling and transporting of books during inspection: | | 314.25 | |
| Storage—3 months | | 450.00 | |
| | | | 1,514.25 |
| | | | $ 51,587.08 |
| Credit to defendant for books sold: | | | 1,000.00 |
| | | | $ 50,587.08 |

Judgment awarded to plaintiff in the sum of $50,587.08, together with interest.

It necessarily follows from the foregoing that defendant's counterclaim is dismissed.

The foregoing shall constitute the court's Findings of Fact and Conclusions of Law.