Harold S. LEE et al., Plaintiffs-Appellees,

v.

JOSEPH E. SEAGRAM & SONS, INC., Defendant-Appellant.

No. 386, Docket 76–7262.

United States Court of Appeals, Second Circuit.

Argued Dec. 8, 1976.

Decided March 15, 1977.

MacDonald Flinn, New York City (E. Miles Prentice; III, Robert W. Mannix and White & Case, New York City, of counsel), for defendant-appellant.

Malcolm A. Hoffmann, New York City (Edward A. Woolley, Robert W. Biggar, Robert C. Agee, Bernard Zucker, Andrew N. Singer and Law Firm of Malcolm A. Hoffmann, New York City, of counsel), for plaintiffs-appellees.

Before MEDINA, OAKES and GURFEIN, Circuit Judges.

GURFEIN, Circuit Judge:

This is an appeal by defendant Joseph E. Seagram & Sons, Inc. ("Seagram") from a judgment entered by the District Court, Hon. Charles H. Tenney, upon the verdict of a jury in the amount of $407,850 in favor of the plaintiffs on a claim asserting common law breach of an oral contract. The court also denied Seagram's motion under Rule 50(b), Fed.R.Civ.P., for judgment notwithstanding the verdict. *Harold S. Lee, et al. v. Joseph E. Seagram and Sons,* 413

F.Supp. 693 (S.D.N.Y.1976). It had earlier denied Seagram's motion for summary judgment. The plaintiffs are Harold S. Lee (now deceased) and his two sons, Lester and Eric ("the Lees"). Jurisdiction is based on diversity of citizenship.[1] We affirm.

The jury could have found the following. The Lees owned a 50% interest in Capitol City Liquor Company, Inc. ("Capitol City"), a wholesale liquor distributorship located in Washington, D.C. The other 50% was owned by Harold's brother, Henry D. Lee, and his nephew, Arthur Lee. Seagram is a distiller of alcoholic beverages. Capitol City carried numerous Seagram brands and a large portion of its sales were generated by Seagram lines.

The Lees and the other owners of Capitol City wanted to sell their respective interests in the business and, in May 1970, Harold Lee, the father, discussed the possible sale of Capitol City with Jack Yogman ("Yogman"), then Executive Vice President of Seagram (and now President), whom he had known for many years. Lee offered to sell Capitol City to Seagram but conditioned the offer on Seagram's agreement to relocate Harold and his sons, the 50% owners of Capitol City, in a new distributorship of their own in a different city.

About a month later, another officer of Seagram, John Barth, an assistant to Yogman, visited the Lees and their co-owners in Washington and began negotiations for the purchase of the assets of Capitol City by Seagram on behalf of a new distributor, one Carter, who would take it over after the purchase. The purchase of the assets of Capitol City was consummated on September 30, 1970 pursuant to a written agreement. The promise to relocate the father and sons thereafter was not reduced to writing.

Harold Lee had served the Seagram organization for thirty-six years in positions of responsibility before he acquired the half interest in the Capitol City distributorship. From 1958 to 1962, he was chief executive

1. Judge Tenney granted Seagram's motion for a directed verdict dismissing certain antitrust claims, which are not the subject of appeal.

officer of Calvert Distillers Company, a wholly-owned subsidiary. During this long period he enjoyed the friendship and confidence of the principals of Seagram.

In 1958, Harold Lee had purchased from Seagram its holdings of Capitol City stock in order to introduce his sons into the liquor distribution business, and also to satisfy Seagram's desire to have a strong and friendly distributor for Seagram products in Washington, D.C. Harold Lee and Yogman had known each other for 13 years.

The plaintiffs claimed a breach of the oral agreement to relocate Harold Lee's sons, alleging that Seagram had had opportunities to procure another distributorship for the Lees but had refused to do so. The Lees brought this action on January 18, 1972, fifteen months after the sale of the Capitol City distributorship to Seagram. They contended that they had performed their obligation by agreeing to the sale by Capitol City of its assets to Seagram, but that Seagram had failed to perform its obligation under the separate oral contract between the Lees and Seagram. The agreement which the trial court permitted the jury to find was "an oral agreement with defendant which provided that if they agreed to sell their interest in Capitol City, defendant in return, within a reasonable time, would provide the plaintiffs a Seagram distributorship whose price would require roughly an amount equal to the capital obtained by the plaintiffs for the sale of their interest in Capitol City, and which distributorship would be in a location acceptable to plaintiffs." No specific exception was taken to this portion of the charge. By its verdict for the plaintiffs, we must assume—as Seagram notes in its brief— that this is the agreement which the jury found was made before the sale of Capitol City was agreed upon.[2]

Appellant urges several grounds for reversal. It contends that, as a matter of law, (1) plaintiffs' proof of the alleged oral agreement is barred by the parol evidence rule; and (2) the oral agreement is too vague and indefinite to be enforceable. Appellant also contends that plaintiffs' proof of damages is speculative and incompetent.

I

Judge Tenney, in a careful analysis of the application of the parol evidence rule, decided that the rule did not bar proof of the oral agreement. We agree.

The District Court, in its denial of the defendant's motion for summary judgment, treated the issue as whether the written agreement for the sale of assets was an "integrated" agreement not only of all the mutual agreements concerning the sale of Capitol City assets, but also of *all* the mutual agreements of the parties. Finding the language of the sales agreement "somewhat ambiguous," the court decided that the determination of whether the parol evidence rule applies must await the taking of evidence on the issue of whether the sales agreement was intended to be a complete and accurate integration of all of the mutual promises of the parties.

Seagram did not avail itself of this invitation. It failed to call as witnesses any of the three persons who negotiated the sales agreement on behalf of Seagram regarding the intention of the parties to integrate all mutual promises or regarding the failure of the written agreement to contain an integration clause.

Appellant contends that, as a matter of law, the oral agreement was "part and parcel" of the subject-matter of the sales contract and that failure to include it in the

---

**2.** The complaint alleged that Seagram agreed to "obtain" or "secure" or "provide" a "similar" distributorship within a reasonable time, and plaintiffs introduced some testimony to that effect. Although other testimony suggested that Seagram agreed merely to provide an opportunity for the Lees to negotiate with third parties, and Judge Tenney indicated in his denial of judgment n. o. v. that Seagram merely agreed "to notify plaintiffs as they learned of distributors who were considering the sale of their businesses," 413 F.Supp. at 698–99, the jury was permitted to find that the agreement was in the nature of a commitment to provide a distributorship. There was evidence to support such a finding, and the jury so found.

written contract barred proof of its existence. *Mitchill v. Lath,* 247 N.Y. 377, 380, 160 N.E. 646 (1928). The position of appellant, fairly stated, is that the oral agreement was either an inducing cause for the sale or was a part of the consideration for the sale, and in either case, should have been contained in the written contract. In either case, it argues that the parol evidence rule bars its admission.

Appellees maintain, on the other hand, that the oral agreement was a collateral agreement and that, since it is not contradictory of any of the terms of the sales agreement, proof of it is not barred by the parol evidence rule. Because the case comes to us after a jury verdict we must assume that there actually was an oral contract, such as the court instructed the jury it could find. The question is whether the strong policy for avoiding fraudulent claims through application of the parol evidence rule nevertheless mandates reversal on the ground that the jury should not have been permitted to hear the evidence. *See Fogelson v. Rackfay Constr. Co.,* 300 N.Y. 334 at 337–38, 90 N.E.2d 881 (1950).

■ The District Court stated the cardinal issue to be whether the parties "intended" the written agreement for the sale of assets to be the complete and accurate integration of all the mutual promises of the parties. If the written contract was not a complete integration, the court held, then the parol evidence rule has no application.[3] We assume that the District Court determined intention by objective standards. *See* 3 Corbin on Contracts §§ 573–574. The parol evidence rule is a rule of substantive law. *Fogelson v. Rackfay Constr. Co., supra; Higgs v. De Maziroff,* 263 N.Y. 473, 477, 189 N.E. 555 (1934); *Smith v. Bear,* 237 F.2d 79, 83 (2d Cir. 1956).

■ The law of New York is not rigid or categorical, but is in harmony with this approach. As Judge Fuld said in *Fogelson:*

"Decision in each case must, of course, turn upon the type of transaction involved, the scope of the written contract and the content of the oral agreement asserted."

300 N.Y. at 338, 90 N.E.2d at 883. And the Court of Appeals wrote in *Ball v. Grady,* 267 N.Y. 470, 472, 196 N.E. 402, 403 (1935):

"In the end, the court must find the limits of the integration as best it may by reading the writing in the light of surrounding circumstances."

*Accord, Fogelson, supra,* 300 N.Y. at 338, 90 N.E.2d 881. Thus, certain oral collateral agreements, even though made contemporaneously, are not within the prohibition of the parol evidence rule "because [if] they are separate, independent, and complete contracts, although relating to the same subject. . . . [t]hey are allowed to be proved by parol, because they were made by parol, and no part thereof committed to writing." *Thomas v. Scutt,* 127 N.Y. 133, 140–41, 27 N.E. 961, 963 (1891).

■ Although there is New York authority which in general terms supports defendant's thesis that an oral contract inducing a written one or varying the consideration may be barred, *see, e. g., Fogelson v. Rackfay Constr. Co., supra,* 300 N.Y. at 340, 90 N.E.2d 881, the overarching question is whether, in the context of the particular setting, the oral agreement was one which the parties would ordinarily be expected to embody in the writing. *Ball v. Grady, supra,* 267 N.Y. at 470, 196 N.E. 402; *accord, Fogelson v. Rackfay Constr. Co., supra,* 300 N.Y. at 338, 90 N.E.2d 881. *See* Restatement on Contracts § 240. For example, integration is most easily inferred in the case of real estate contracts for the sale of land, *e. g., Mitchill v. Lath, supra,* 247 N.Y. 377, 160 N.E. 646, or leases, *Fogelson, supra; Plum Tree, Inc. v. N.K. Winston Corp.,* 351 F.Supp. 80, 83 (S.D.N.Y.1972). In more complex situations, in which customary business practice may be more varied, an

---

**3.** Though the parties have not urged the particular choice of law applicable, both parties appear to assume that New York law governs. We note that in cases of this type, which depend so much on their particular facts and for which direct precedent is therefore so sparse, virtually all jurisdictions would be expected to follow general common law principles.

oral agreement can be treated as separate and independent of the written agreement even though the written contract contains a strong integration clause. *See Gem Corrugated Box Corp. v. National Kraft Container Corp.*, 427 F.2d 499, 503 (2d Cir. 1970).

■ Thus, as we see it, the issue is whether the oral promise to the plaintiffs, as individuals, would be an expectable term of the contract for the sale of assets by a corporation in which plaintiffs have only a 50% interest, considering as well the history of their relationship to Seagram.

Here, there are several reasons why it would *not* be expected that the oral agreement to give Harold Lee's sons another distributorship would be integrated into the sales contract. In the usual case, there is an identity of parties in both the claimed integrated instrument and in the oral agreement asserted. Here, although it would have been physically possible to insert a provision dealing with only the shareholders of a 50% interest, the transaction itself was a *corporate* sale of assets. Collateral agreements which survive the closing of a corporate deal, such as employment agreements for particular shareholders of the seller or consulting agreements, are often set forth in separate agreements. *See Gem Corrugated Box Corp. v. National Kraft Container Corp., supra,* 427 F.2d at 503 ("it is . . . plain that the parties ordinarily would not embody the stock purchase agreement in a writing concerned only with box materials purchase terms"). It was expectable that such an agreement as one to obtain a new distributorship for certain persons, some of whom were not even parties to the contract, would not necessarily be integrated into an instrument for the sale of *corporate* assets. As with an oral condition precedent to the legal effectiveness of an otherwise integrated written contract, which is not barred by the parol evidence rule if it is not directly contradictory of its terms, *Hicks v. Bush,* 10 N.Y.2d

488, 225 N.Y.S.2d 34, 180 N.E.2d 425 (1962); *cf.* 3 Corbin on Contracts § 589, "it is certainly not improbable that parties contracting in these circumstances would make the asserted oral agreement . . . ." 10 N.Y.2d at 493, 225 N.Y.S.2d at 39, 180 N.E.2d at 428.

Similarly, it is significant that there was a close relationship of confidence and friendship over many years between two old men, Harold Lee and Yogman, whose authority to bind Seagram has not been questioned. It would not be surprising that a handshake for the benefit of Harold's sons would have been thought sufficient. In point, as well, is the circumstance that the negotiations concerning the provisions of the sales agreement were not conducted by Yogman but by three other Seagram representatives, headed by John Barth. The two transactions may not have been integrated in their minds when the contract was drafted.[4]

Finally, the written agreement does not contain the customary integration clause, even though a good part of it (relating to warranties and negative covenants) is boilerplate. The omission may, of course, have been caused by mutual trust and confidence, but in any event, there is no such strong presumption of exclusion because of the existence of a detailed integration clause, as was relied upon by the Court of Appeals in *Fogelson, supra,* 300 N.Y. at 340, 90 N.E. 881.

Nor do we see any contradiction of the terms of the sales agreement. *Mitchill v. Lath, supra,* 247 N.Y. at 381, 160 N.E. 646; 3 Corbin on Contracts § 573, at 357. The written agreement dealt with the sale of corporate assets, the oral agreement with the relocation of the Lees. Thus, the oral agreement does not vary or contradict the money consideration recited in the contract as flowing to the selling corporation. That is the only consideration recited, and it is

---

4. Barth in a confidential memorandum dated June 12, 1970 to Yogman and Edgar Bronfman stated that "he [Harold Lee] would very much like to have another distributorship in another area for his two sons." Apparently Barth, who was not present at Harold Lee's meeting with Yogman, assumed that this was a desire on the part of Lee rather than a promise made by Yogman for Seagram.

still the only consideration to the corporation.[5]

We affirm Judge Tenney's reception in evidence of the oral agreement and his denial of the motion under Rule 50(b) with respect to the parol evidence rule.

## II

■ Appellant contends, however, that the jury verdict cannot stand because the oral agreement was so vague and indefinite as to be unenforceable. First, appellant argues that the failure to specify purchase price, profitability or sales volume of the distributorship to be provided, is fatal to the contract's validity. The contention is that, because the oral agreement lacks essential terms, the courts cannot determine the rights and obligations of the parties. *See* 1 Corbin on Contracts § 95, at 394. Second, appellant contends that the agreement is unenforceable because there were no specific limits to plaintiffs' discretion in deciding whether to accept or reject a particular distributorship; and hence the agreement was illusory.[6]

■ The alleged agreement, as the jury was permitted to find, was to provide the Lees with a liquor distributorship of approximately half the value and profit potential of Capitol City, within a reasonable time. The distributorship would be "in a location acceptable to plaintiffs," and the price would require roughly an amount equal to the plaintiffs' previous investment in Capitol City. The performance by plaintiffs in agreeing to the sale of Capitol City caused the counter-performance of the oral promise to mature.

Once the nature of the agreement found by the jury is recognized, it becomes clear that appellant's contentions are without merit. As for the alleged lack of essential terms, there was evidence credited by the jury, which *did* establish the purchase price, profitability and sales volume of the distributorship with reasonable specificity. In addition to the direct testimony of the Lees, there was evidence that distributorships were valued, as a rule of thumb, at book value plus three times the previous year's net profit after taxes. Between this industry standard and the reference to the Capitol City transaction, there was extrinsic evidence to render the parties' obligations reasonably definite. Professor Corbin has observed that a court should be slow to deny enforcement "if it is convinced that the parties themselves meant to make a 'contract' and to bind themselves to render a future performance. Many a gap in terms can be filled, and should be, with a result that is consistent with what the parties said and that is more just to both of them than would be a refusal of enforcement." Corbin on Contracts § 97, at 425–26. New York courts are in accord in hesitating to find that a contract is too indefinite for enforcement. *See Borden v. Chesterfield Farms, Inc.,* 27 A.D.2d 165, 277 N.Y.S.2d 494 (1st Dep't 1967); *Valley Nat'l Bank v. Babylon Chrysler-Plymouth,* 53 Misc.2d 1029, 280 N.Y.S.2d 786, *aff'd,* 28 A.D.2d 1092, 284 N.Y.S.2d 849 (2d Dep't 1967); *Silverman v. Alport,* 282 App.Div. 631, 125 N.Y.S.2d 602, 605 (3d Dep't 1953); *Castelli v. Tolibia,* 83 N.Y.S.2d 554 (S.Ct.1948), *aff'd,* 276 App.Div. 1066, 96 N.Y.S.2d 488 (1st Dep't 1950). The requirement that the al-

---

5. *Cf. Mitchill v. Lath,* 247 N.Y. 377, 380–81, 160 N.E. 646, 647 (1928) (to escape the parol evidence rule, the oral agreement "must not contradict express or implied provisions of the written contract."). The parties do not contend, and we would be unwilling to hold, that the oral agreement was not "in form a collateral one." *Id.*

6. Appellant makes two other contentions in this regard, which may be disposed of summarily. It argues that the evidence introduced by plaintiffs was so contradictory and confusing that the jury could not ascertain Seagram's

obligations with any definiteness. Although plaintiffs apparently did not try their case on a single coherent theory, *see* note 2 *supra,* the short answer is that, by its verdict, the jury gave credence to some of the evidence, discounted the remainder, and drew its inferences accordingly. *Id.* Second, appellant suggests that the evidence demonstrates at best Seagram's friendly willingness to *help* the Lees in their efforts to relocate, but no commitment to undertake any legal obligation. The short answer again is that there was contrary testimony which the jury chose to believe.

leged oral agreement be performed within a reasonable time is particularly unobjectionable, see Valley Nat'l Bank, supra, especially in light of the fact, which Seagram knew, that plaintiffs would have to reinvest the proceeds from the sale of Capitol City within one year or suffer adverse tax consequences.[7]

■ As for the alleged unbridled discretion which the oral agreement conferred on the plaintiffs, we similarly conclude that there is no fatal defect. We note at the outset that the requirement that the new distributorship be "acceptable" to the Lees did not render the agreement illusory in the sense that it is not supported by consideration; the Lee's part of the bargain was to join in the sale of Capitol City's assets and assignment of its franchise, which they had already performed. More importantly, we do not agree that the Lees had "unbridled" discretion. New York courts would in all events impose an obligation of good faith on the Lees' exercise of discretion, see. e. g., Wood v. Lucy, Lady Duff-Gordon, 222 N.Y. 88, 118 N.E. 214 (1917), and there was also extrinsic evidence of what would constitute an "acceptable distributorship," and hence constitute reasonable performance by Seagram. Seagram appears to contend that if it had tendered reasonable performance, by offering an acceptable distributorship to the Lees, that the Lees nevertheless could have found it not "acceptable." This is not correct. It is true that Seagram could not have forced the Lees to take a distributorship, because they had not promised to do so. But Seagram's tender of reasonable performance would discharge its obligations under the oral agreement, whether or not the Lees "accepted." See 15 Williston on Contracts §§ 1808–10 (3d ed. 1972). The Lees could not prevent Seagram from fulfilling its obligations by unreasonably refusing an acceptable distributorship. Since the obligations of the parties under the contract therefore were ascertainable, it was not void for indefiniteness. Cf. Mason v. Rose, 176 F.2d 486, 489 (2d Cir. 1949).

### III

The jury awarded the two sons and the estate of the father damages in the amount of $407,850. The essence of the court's charge on the subject was that in a contract action the basic principle of damages "is to indemnify a plaintiff for the gains prevented and the losses sustained by a defendant's breach, to leave him no worse but in no better position than he would have been had the breach not occurred." The court charged that the jury was to determine the reasonable value of the injury, if any. It charged further that "from the sum thus arrived at, you will then deduct such amount, if any, as from the evidence you find fairly measures the benefit to plaintiffs resulting from the fact that plaintiffs were freed to engage their services and capital in other situations during the time they would otherwise have been engaged in the management of an investment in the alleged promised distributorship."

■ Plaintiffs introduced testimony by Ernest L. Sommers, a certified public accountant, whom the District Court found to be qualified as an expert. Sommers compared one-half of the profits of Capitol City in its last fiscal year ending June 1, 1970 on the theory that profits for the past five years showed an upward trend, with the amount earned on investments in bonds by the plaintiffs in the year succeeding the sale. He found that one-half of the Capitol City pre-tax profits, based on one-half the sales price, amounted to 14.508%. The return on the bond investment was 7.977%. He then subtracted the percentage return

---

7. Seagram also appears to contend that a promise to "relocate" is insufficiently specific. We disagree. Aside from the ordinary meaning of the word, the jury could rely on evidence, which was introduced, of other efforts by Seagram to "provide" a distributorship for other distributors—including Seagram's successful effort to provide Chet Carter with the Capitol City distributorship by purchasing it on his behalf, cf. Borden v. Chesterfield Farms, Inc., 27 A.D.2d 165, 277 N.Y.S.2d 494 (1st Dep't 1967), and Harold Lee's own experience in his original purchase of the 50% interest in Capitol City directly from Seagram.

on the investment bonds from the percentage return of the Capitol City operation, which gave him a percentage figure for the loss occasioned by the breach, of 6.531%. This figure, applied to one-half the sales price, came to $83,800 per annum before taxes. Multiplying this figure by only ten years—an assumed minimum measure for the life of the "new" distributorship—would make an $838,000 total loss. Discounting to present value, the witness reduced the figure to $549,000. The jury returned a verdict, as we have seen, for a lesser amount, $407,850. There is, therefore, no element of damage in the verdict amount for which no evidence was submitted to the jury. *See Locke v. United States,* 283 F.2d 521, 151 Ct.Cl. 262 (1960). Appellant contends, however, that plaintiffs' proof of damages was speculative and incompetent.

■ Appellant's position is based in large measure on some confusion about the precise nature of the agreement found by the jury, *see* notes 2 *and* 7 *supra.* Plaintiffs' evidence bore directly on the damages sustained by breach of a contract to provide a distributorship of one-half the cost and worth of Capitol City, and on the "fair measure" of the sums properly deducted. Appellant's contention that plaintiffs should have been required to prove, as a *sine qua non* to any damage award, that there was a Seagram distributor actually willing to sell his distributorship to them, is without merit. The oral agreement, as the jury was permitted to find, was for Seagram to *provide* a distributorship for the Lees. The jury was permitted to find that Seagram could have fulfilled this obligation by steering a voluntary sale of a distributorship to the plaintiffs or could have financed an intermediate transaction, warehousing the acquired distributorship for the plaintiffs, *see* note 2 *supra.*

■ Seagram contends that lost profits are not the proper measure of damages for breach of contract, and that cases allowing damages for destruction of injury to an

ongoing business are not controlling. Lost profits can, however, be a proper measure of damages for breach of contract. As the Court of Appeals for the First Circuit said in *Standard Machinery Co. v. Duncan Shaw Corp.,* 208 F.2d 61, 64:

> "Certainly no authority need be cited for the broad proposition that prospective profits, if proved, are an element of a plaintiff's damages for breach of contract, or for the further proposition that evidence of past profits from an established business provides a reasonable basis for estimating future profits from the business."

*See Perma Research & Devel. Co. v. Singer Co.,* 402 F.Supp. 881, 898 (S.D.N.Y.1975), *aff'd,* 542 F.2d 111 (2d Cir. 1976); *For Children, Inc. v. Graphics Int'l, Inc.,* 352 F.Supp. 1280, 1284 (S.D.N.Y.1972). This is so even if the prospective business has not yet begun operation. *See For Children, Inc., supra,* 352 F.Supp. at 1284; *William Goldman Theatres v. Loew's, Inc.,* 69 F.Supp. 103, 105–06 (E.D.Pa.1946), *aff'd,* 164 F.2d 1021 (3d Cir.), *cert. denied,* 334 U.S. 811, 68 S.Ct. 1016, 92 L.Ed. 1742 (1948).

■ Seagram objects to the fact that plaintiffs' proof concerned the profit experience of Capitol City. It suggests that the best way of determining profits would be to consider the profits of an existing distributorship. But it came forward with no such proof, presumably for tactical reasons. We hold that the method of proof used by the plaintiffs was adequate in the circumstances. Since Seagram's breach has made difficult a more precise proof of damages, it must bear the risk of uncertainty created by its conduct. *Bigelow v. RKO Radio Pictures,* 327 U.S. 251, 264–65, 66 S.Ct. 574, 90 L.Ed. 652 (1946); *Story Parchment Co. v. Paterson Parchment Paper Co.,* 282 U.S. 555, 563, 51 S.Ct. 248, 75 L.Ed. 544 (1931); *Eastman Kodak Co. v. Southern Photo Co.,* 273 U.S. 359, 379, 47 S.Ct. 400, 71 L.Ed. 684 (1929); *Perma Research & Devel. Co. v. Singer Co.,* 542 F.2d 111, 116 (2d Cir. 1976); *Autowest, Inc. v. Peugeot, Inc.,* 434 F.2d 556, 565 (2d Cir. 1970); *For Children, Inc. v.*

*Graphics Int'l, Inc.,* 352 F.Supp. 1280, 1284 (S.D.N.Y.1972). New York law is in accord. *Spitz v. Lesser,* 302 N.Y. 490, 99 N.E.2d 540 (1951). As the court said in *Wakeman v. Wheeler Mfg. Co.,* 101 N.Y. 205, 209, 4 N.E. 264, 266 (1886):

> "When it is certain that damages have been caused by a breach of contract, and the only uncertainty is as to their amount, there can rarely be good reason for refusing, on account of such uncertainty, any damages whatever for the breach. A person violating his contract should not be permitted entirely to escape liability because the amount of damages which he has caused is uncertain."

*Accord, Randall-Smith v. 43rd Street Estates Corp.,* 17 N.Y.2d 99, 105–06, 268 N.Y. S.2d 306, 215 N.E.2d 494 (1976); *cf. Herman Schwabe, Inc. v. United Shoe Machinery Co.,* 297 F.2d 906 (2d Cir. 1962).

Mere dispute on the validity of some of the figures cannot wipe out the evidence but merely emphasizes that the jury was presented with a factual question whose determination we should not change. *See Washington State Bowling Proprietors Ass'n v. Pacific Lanes, Inc.,* 356 F.2d 371, 379 (9th Cir. 1966). "The trial court has a large amount of discretion in determining whether to submit the question of profits to the jury; and when it is so submitted, the jury will also have a large amount of discretion in determining the amount of its verdict." 5 Corbin on Contracts § 1022, at 145–46. *Cf. Herman Schwabe, supra,* 297 F.2d at 912.

Affirmed.