SMITH BARNEY, HARRIS UPHAM & CO. INCORPORATED, Plaintiff,

v.

LIECHTENSTEINISCHE LANDES-BANK, The Dow Chemical Company, Citibank, N.A., and The Depository Trust Company, Defendants.

No. 92 Civ. 2528 (RPP).

United States District Court, S.D. New York.

Sept. 16, 1994.

Skadden, Arps, Slate, Meagher & Flom by William P. Frank, New York City, for plaintiff Smith Barney, Harris Upham & Co.

Proskauer, Rose, Goetz & Mendelsohn by Gregg M. Mashberg, New York City, for defendant Depository Trust Co.

**OPINION AND ORDER**

ROBERT P. PATTERSON, Jr., District Judge.

This is an action for money damages in which Plaintiff, Smith Barney, Harris Upham & Co., Inc. ("Smith Barney") charges Defendant [1], The Depository Trust Company

---

1. Smith Barney has settled with Defendant Liechtensteinische Landesbank. Defendants Citibank, N.A. and The Dow Chemical Company are not parties to this motion for summary judgment.

("DTC"), with breach of contract for failure to inform Smith Barney, within a reasonable period of time, of the confiscation by Citibank N.A. ("Citibank") of certificates of debenture of The Dow Chemical Company, Inc. ("Dow"), certificates which Smith Barney had agreed not only to purchase from Liechtensteinische Landesbank ("Landesbank") but also to sell to a third party. Defendant moves for summary judgment pursuant to Rule 56(c) on the grounds that it did not breach any express or implied contractual obligation to Smith Barney and that Smith Barney is not entitled to damages since the damages it seeks were not the probable result of DTC's alleged breach of its contractual obligations.

**BACKGROUND**

**I. The Agreement Between Smith Barney and DTC**

DTC, a limited purpose trust company organized under the Banking Law of the State of New York, is a securities depository and clearing agency established to facilitate the settlement of securities transactions among the financial institutions (i.e., brokerage firms) that constitute its "Participants." DTC's Rule 3(g), ¶5. DTC is owned by its Participants as well as other financial institutions and controls over 90% of the clearinghouse business in the United States.

On February 2, 1976, Smith Barney, a corporation which is engaged in the securities underwriting, brokerage and investment banking businesses and which is a member of all principal securities and futures exchanges in the United States, became a DTC Participant pursuant to a Participant's Agreement ("Agreement") executed by DTC and Smith Barney. The Agreement was a form agreement drafted by DTC which Smith Barney did not negotiate. Grant Decl.Ex. 65 ¶38. The Agreement provides that DTC and Smith Barney agree to be bound by the rules promulgated by DTC, which in turn bind the parties to follow DTC's Participant Operating Procedures. Grant Decl.Ex. 60, 62 at 61.

Under DTC's Participant Operating Procedures, if a deposit of securities is rejected by

DTC, "the Participant will receive a DTC Deposit Rejection Notice together with the securities via DTC's Central Delivery Department." *Id.* at Ex. 55. In the event of confiscation of deposited securities "by a law enforcement agency, the issuer or an agent of the issuer, the Participant will receive a copy of the receipt for such securities provided by DTC." *Id.*

**II. The Dow Debentures**

The present action arises out of the issuance in 1978 by Defendant Dow of 8.625% debentures (i.e., bonds) in the principal amount of $300,000,000. DTC's Rule 3(g) St. ¶7. Upon their issuance, Dow caused certificates evidencing the debentures to be delivered to various underwriters, including Smith Barney; these debentures were subsequently resold by the underwriters to third parties. *Id.*

Upon the resale of the debentures to third parties, the original certificates were delivered to Citibank, the transfer agent for the issue, for re-registration in the name of a new registered owner. *Id.* ¶8. Citibank cancelled the original certificates on its books and issued new certificates in place of the originals. *Id.* Then, Citibank released the original certificates to an outside contractor for disposal. However, the certificates were not disposed of and re-entered the stream of commerce. *Id.*

On November 6, 1991, Defendant Landesbank, a banking entity organized under the laws of Liechtenstein, presented for sale to Smith Barney's Zurich office 85 certificates purporting to represent $6,175,000 of the principal amount of the Dow 8.625% debentures (the "Certificates"). *Id.* ¶2 & 9. Thereafter, Smith Barney's Zurich office sent the Certificates to Smith Barney's New York office where they arrived on November 8, 1991. *Id.* ¶10.

On November 11, 1991, Smith Barney's Zurich office called Smith Barney's New York office and issued a sell order for the Certificates.[2] *Id.* ¶11. On the same day, Smith Barney presented the Certificates to DTC in New York for credit to Smith Bar-

---

**2.** Smith Barney thereafter sold the securities to a third party.

ney's DTC account and transfer into street name. *Id.* ¶ 12. On November 12, 1991, DTC credited Smith Barney's DTC account in the amount of $6,175,000, the face value of the Certificates. *Id.* ¶ 12.

## III. Activities of DTC

Between November 11 and November 13, 1991, DTC inspected the Certificates and then delivered them to Citibank for re-registration into the name of DTC's nominee Cede & Co. for the beneficial interest of Smith Barney. *Id.* ¶ 13. On November 13, 1991, Ray Dugan, an Assistant Supervisor in DTC's Deposit section, received a telephone call from James C. Bourke, Operations Manager at Citibank. Mr. Bourke informed Mr. Dugan that the Certificates deposited by Smith Barney had been previously cancelled and thus had no value. *Id.* ¶ 14. Also on November 13, Mr. Bourke sent a letter by telecopy facsimile to Mr. Dugan confirming their telephone conversation and indicating that perforations in the Certificates revealed that they had been previously cancelled and were therefore being confiscated by Citibank. Montal Decl.Ex. 23. Mr. Dugan took no immediate action in response to Mr. Bourke's telephone call and letter.

Without knowledge or notice of the defect or the confiscation and without waiting for any communication from DTC, Smith Barney wired $6,195,171.09, the proceeds of the sale of the Certificates, to Landesbank on November 18, 1991, the settlement date under Smith Barney's contract with Landesbank for the purchase of the Certificates. DTC's Rule 3(g) St. ¶ 15.

On November 21, 1991 DTC's Aging Transfer Department, while researching the status of other bonds that DTC had sent to Citibank for re-registration, learned of the confiscation of the Certificates and of the November 13, 1991 letter sent by Mr. Bourke to Mr. Dugan. *Id.* ¶ 17. Besides apprising the Aging Transfer Department of the confiscation of the Certificates, Citibank also informed the department that "the Certificates were part of a much larger group of previously cancelled perforated securities that were thought to have been destroyed and had re-entered the stream of commerce,

and that the Federal Bureau of Investigation was investigating." *Id.* ¶ 18. On the same day, Al Hutton, DTC director in charge, informed Smith Barney Vice President Raymond DiSanza over the telephone that the Certificates had been rejected and confiscated by the transfer agent and were being investigated by the Federal Bureau of Investigation. *Id.* ¶ 19. Furthermore, Mr. Hutton explained to Mr. DiSanza that due to the cancellation of the Certificates, Smith Barney's DTC account would be debited in the amount it had previously been credited for the Certificates. *Id.*

Thereafter, Smith Barney sought to recover the purchase price of the Certificates, $6,195,171.09, from Landesbank. When Landesbank refused to reimburse the purchase price, Smith Barney froze Landesbank's account with Smith Barney which contained approximately $3.1 million. *Id.* ¶ 21. Smith Barney then purchased Dow debentures of the same series and amount as the Certificates and deposited them with DTC to cover its contractual obligations to the third party purchaser.

Subsequently, Smith Barney filed this suit for money damages against DTC as well as other institutions claiming, in regard to DTC, that DTC breached its contractual duties under the Agreement by failing to notify Smith Barney within a reasonable time that the Certificates had been confiscated.

## DISCUSSION

### I. Standard for Summary Judgment

Rule 56(c) of the Federal Rules of Civil Procedure provides that summary judgment "shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." *See also Anderson v. Liberty Lobby Inc.*, 477 U.S. 242, 247, 106 S.Ct. 2505, 2509–10, 91 L.Ed.2d 202 (1986). The moving party bears the initial burden of demonstrating that there exists no genuine issue of material fact and that it is entitled to a judgment as a matter of law. *See Adickes v. S.H. Kress &*

*Co.,* 398 U.S. 144, 157, 90 S.Ct. 1598, 1608, 26 L.Ed.2d 142 (1970).

Although when deciding a motion for summary judgment a court must "resolve all ambiguities, and draw all inferences ... in the light most favorable to the party opposing the motion", *United States v. Diebold, Inc.,* 369 U.S. 654, 655, 82 S.Ct. 993, 993, 8 L.Ed.2d 176 (1962) (*per curiam* ), the party opposing a properly supported motion for summary judgment "may not rest upon the mere allegations or denials of the adverse party's pleading, but ... must set forth specific facts showing that there is a genuine issue for trial." Fed.R.Civ.P. 56(e). Therefore, "[i]f reasonable minds could differ as to the import of the *evidence,* and [i]f ... there is any *evidence* in the record from any source from which a reasonable inference in the [nonmoving party's] favor may be drawn," the motion for summary judgment must be denied. *Brady v. Town of Colchester,* 863 F.2d 205, 211 (2d Cir.1988) (emphasis added) (citations omitted). "[T]he mere existence of a scintilla of evidence" in support of the nonmovant's position is insufficient to defeat a properly supported motion for summary judgment; there must be evidence on which the jury could reasonably find for the nonmovant. *Anderson,* 477 U.S. at 252, 106 S.Ct. at 2512.

## II. Smith Barney's Breach of Contract Claim against DTC

■ Under New York law, where a contract is silent regarding the time for performance, a duty to perform within a reasonable time is implied unless the parties have specifically "negotiated over and rejected that particular contract term." *Enzo Biochem, Inc. v. Johnson & Johnson,* 1992 WL 309613, at *6 (S.D.N.Y.1992); *see also Lee v. Joseph E. Seagram & Sons, Inc.,* 413 F.Supp. 693, 698 (S.D.N.Y.1976), *aff'd,* 552 F.2d 447 (2d Cir. 1977); *Bruce Realty Co. v. Berger,* 327 F.Supp. 507, 513 (S.D.N.Y.1971); *Zev v. Merman,* 73 N.Y.2d 781, 536 N.Y.S.2d 739, 533 N.E.2d 669 (1988). Because neither the Agreement nor the DTC operating procedures specifies the precise time within which DTC is required to give notice of cancellations or confiscations of securities deposited with DTC and because DTC did not negotiate with Smith Barney over the terms of the Agreement or the content of the rules or operating procedures, DTC was required to notify Smith Barney of rejections and confiscations within a reasonable time.

■ In determining what constitutes a reasonable time for performance, courts consider several factors, including: (1) the nature and object of the contract; (2) the previous conduct of the parties; (3) the presence or absence of good. faith; (4) the experience of the parties and the possibility of prejudice or hardship to either one. *Zev,* 536 N.Y.S.2d at 739, 533 N.E.2d at 669; *see also United States for Use and Benefit of Falco Constr. Corp. v. Summit General Contracting Corp.,* 760 F.Supp. 1004, 1012 (E.D.N.Y.1991). "The question of what is a reasonable period of time for performance of a particular contract is a question of fact for a jury, unless the facts are undisputed, in which case the question becomes one appropriate for summary judgment." *Enzo Biochem, Inc.,* 1992 WL 309613, at *6. Since the facts underlying DTC's notification of Smith Barney are undisputed, the question of whether DTC notified Smith Barney of the confiscation of the Certificates within a reasonable period of time may be determined on this motion.

■ The application of the *Zev* factors to the undisputed facts of this case leads to the conclusion that DTC provided notification to Smith Barney within a reasonable time. First, the nature and object of the Agreement, and thus of all rules and procedures thereunder (including the DTC deposit rejection procedure), is that DTC would provide transfer depository services of a ministerial nature to Smith Barney; these services facilitated the settlement of securities transactions and permitted Smith Barney to make book entry transfers of securities held by DTC on Smith Barney's account as opposed to making physical transfers of the certificates at the time of closing.

With respect to the previous conduct of the parties, the second *Zev* factor, DTC's records, which are not disputed, indicate that in October and November 1991, DTC rejected 155 Smith Barney deposits and that an average of 13 calendar days elapsed between the

deposit of securities and notification of the rejections by DTC (Thakkar Aff. ¶ 5 (Montal Decl., Ex. 10)), three days longer than the ten calendar days which expired between November 11, 1991 when Smith Barney deposited the Certificates at DTC in New York for credit to Smith Barney's DTC account (*See* DTC's Rule 3(g) St. ¶ 15) and November 21, 1991 when DTC director in charge, Alan Hutton, called Smith Barney Vice President Raymond DiSanza and told him that the Certificates had been rejected. (*See* Id. at ¶ 19 and Hutton Aff. at 153–54)

DTC's records also show that Smith Barney credited its customers' accounts by computer on the morning of the fifth business day after the trade date. This indicates that the DTC deposit rejection procedure played no operative role in Smith Barney's securities settlement process.[3] *Id.* at Ex. 7, Response No. 3. Furthermore, it is undisputed that, throughout their contractual relationship of over 15 years, Smith Barney has complained only once to DTC that an unreasonable amount of time had elapsed between the date of a securities deposit and the date Smith Barney was notified of the deposit's rejection. The lack of complaints is evidence that with average delays of 13 calendar days DTC was fulfilling its contractual duties as intended by the parties. Dirks Aff. ¶ 39; Montal Decl.Ex. 8 at 195 and Ex. 14.

The application of the third *Zev* factor, the presence or absence of good faith, to the undisputed facts evinces that on the occasion at issue DTC could have acted with greater consideration of Smith Barney's interests. Nevertheless, because this disregard of Smith Barney's interest was the result of the actions of only one DTC employee, Mr. Dugan,[4] and because DTC notified Smith Barney of the confiscation of the Certificates immediately after discovering Mr. Dugan's alleged carelessness which was well within what the evidence shows was the normal notification of rejection period, there is not evidence upon which a jury could determine

an absence of good faith on the part of DTC in carrying out its contractual duty.

Finally, with regard to the possibility of prejudice or hardship to either party, the undisputed evidence buttresses the conclusion that the parties did not intend that DTC insure Smith Barney's deposits. The conclusion is drawn from the following undisputed facts: (1) in accordance with the DTC fee schedule in effect during November 1991, which sets fees irrespective of the value of the securities deposited, DTC charged Smith Barney $2.20, (Thakkar Aff. ¶ 8); (2) DTC was not apprised of the length of time within which Smith Barney needed to be told of the unmarketability of a deposited security in order to avert a loss (Montal Decl.Ex. 6, Admission No. 9); (3) Smith Barney settled Securities Transactions with its customers without first having learned from DTC the status of the re-registration process concerning those securities. (Montal Decl.Ex. 6, Admission No. 3) and (4) the history of the relationship of the parties did not reflect that DTC had assumed the role of guarantor in an insurance relationship. Accordingly, a conclusion that Smith Barney should bear the risk of loss does not result in prejudice to Smith Barney.

Thus, the application of the *Zev* factors to the undisputed facts of the case shows that DTC notified Smith Barney of the confiscation of the Certificates within a time period the parties had considered reasonable during the life of the contract.

Plaintiff's arguments that there exists a genuine issue of material fact are misplaced. Plaintiff first contends that the reasonableness of DTC's notification must be determined not with reference to the time between when a deposit is made by a Participant and when the Participant receives notice of a rejection from DTC, but with reference to the time that elapses between DTC's receipt of actual notice of any confiscation or rejection and DTC's communication of this information to the Participant. Plaintiff bas-

---

3. In fact, Smith Barney admits that it is not uncommon for it to deposit securities at DTC after having credited its customer's account for the deposit. (Montal Decl.Ex. 6, Admission No. 8).

4. Mr. Dugan worked in the deposit section of DTC and was not responsible for confiscation problems. Dirks Aff. ¶¶ 49–50.

es this "actual notice" contention on statements put forth in an affidavit made by Jerome J. Clair, a senior vice-president of Smith Barney. In his affidavit, Mr. Clair asserts that "Under the Participant's Agreement, the Rules and Participant Operating Procedures, DTC is obligated to notify Smith Barney whenever securities which it has deposited have been confiscated . . . Smith Barney relies on DTC to pass along information it does receive in a prompt efficient manner." Clair Aff. at ¶¶ 53–54. Yet Plaintiffs point to no evidence that DTC also understood that its obligation was such.

By maintaining that "the correct time period" to examine was the time between when DTC received notice from Citibank that the security certificates were confiscated and when DTC notified Smith Barney of the rejection, Plaintiff is asking that the Court examine this breach of contract claim under the lens of tort law. By focusing on the time period between DTC's actual notice and when Smith Barney was informed, the Court would be determining whether Defendant acted reasonably in a given situation rather than focusing on whether Defendant had fulfilled its contractual obligation within a reasonable time. Mr. Clair testified that Smith Barney had no knowledge regarding the time taken by DTC's internal Operations to process a rejection letter. Clair Dep. 189–90, 193–95 (Ex. 8). It is undisputed that Smith Barney had no knowledge regarding the time it took DTC to process a rejection letter. Therefore, Smith Barney could have no expectation that DTC would process a rejection notice within a particular number of days after receiving notice of the rejection from the transfer agent.

The only information from which Smith Barney could have formulated a reasonable expectation regarding the time it took DTC to process a rejection letter is the statistical data with respect to the time that elapsed between the date Smith Barney made a deposit and the date Smith Barney was notified that it had been confiscated or rejected. Therefore, the only arguable expectation on the part of Smith Barney is that it would receive notice a certain number of days from the deposit of securities. This expectation was met in this case, as discussed above.

Plaintiff also contends that there is a difference between rejections and confiscations and that the parties' experience with respect to deposit rejections does not provide the standard by which the Court should determine whether Defendant fulfilled its contractual obligations in a timely manner. Plaintiff points out that unlike deposit rejections which encompass errors that can be corrected and thus do not represent a significant risk of financial loss, confiscation of securities presents a substantial risk of loss because confiscated securities are withheld by the transfer agent and contain incurable defects. However, there is no evidence to suggest that the Agreement required DTC to treat confiscations and rejections differently. In fact, the uncontroverted evidence demonstrates to the contrary; that confiscations occurred frequently and therefore that the confiscation in question was not a unique one, requiring special treatment (see Montal Supp.Decl., Ex. 36). The unrebutted evidence also demonstrates that DTC's procedures for processing rejections that entailed confiscations were identical to its procedures for processing other types of rejections (see Grant Decl.Ex. 55).

Thus, Plaintiff has failed to show that there exists a genuine issue of material fact requiring DTC to stand trial.

## CONCLUSION

For the reasons stated above, Defendant DTC's motion for summary judgment is granted. Counsel for the parties remaining are to attend a pretrial conference on September 28, 1994 at 9:00 a.m. in courtroom 302.

IT IS SO ORDERED.