Paul J. DUJARDIN, Plaintiff,

v.

LIBERTY MEDIA CORPORATION
and Liberty Livewire Corporation,
Defendants.

No. 01CIV.10811(LTS) (DCF).

United States District Court,
S.D. New York.

March 16, 2005.

Proskauer Rose LLP, By Bruce E. Fader, Esq., David Alan Picon, Esq., Jeremy J. Best, Esq., Richard J. Costa, Esq., New York, for Plaintiff.

O'Melveny & Myers LLP, By Barry H. Goldstein, Esq., David I. Miller, Esq., New York, for Defendants Liberty Media Corporation and Liberty Livewire Corporation.

## OPINION AND ORDER

SWAIN, District Judge.

Before the Court are the motion of Defendants Liberty Media Corporation ("Liberty Media") and Liberty Livewire Corporation ("Livewire") (collectively, "Defendants") to dismiss certain counts of the complaint pursuant to Rules 12(b)(6) and 9(b) of the Federal Rules of Civil Procedure, and to stay or dismiss Count V of the complaint pending arbitration; the motion of Plaintiff Paul J. Dujardin ("Plaintiff" or "Dujardin") for summary judgment as to Count V of the complaint pursuant to Rule 56 of the Federal Rules of Civil Procedure; and the motion of Defendants Liberty Media and Livewire for the imposition of sanctions against Dujardin and his attorneys, Proskauer Rose LLP ("Proskauer"), pursuant to Rule 11 of the Federal Rules of Civil Procedure.

In his six-count complaint, Dujardin alleges that Defendants engaged in wrongful conduct in connection with Dujardin's sale of Triumph Communications, Inc. ("Triumph"), a company Dujardin had founded, to Livewire, a subsidiary of Liberty Media. Dujardin asserts claims of fraud under Section 10(b) of the Securities Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b–5 promulgated thereunder, against both Defendants and, under Section 20(a) of the Securities Exchange Act, 15 U.S.C. § 78t, against Liberty Media. Dujardin also asserts claims of common law fraud and negligent misrepresentation against both Defendants, as well as breach of contract claims against Livewire.

The Court has jurisdiction of Plaintiff's claims pursuant to 28 U.S.C. §§ 1331, 1332 and 1367. For the following reasons, Defendants' motion to dismiss the complaint is granted in part and denied in part, Plaintiff's motion for summary judgment is granted in part and denied in part, and Defendants' motion for sanctions is denied.

## BACKGROUND [1]

### Genesis and Development of the Triumph Entities

Dujardin started Triumph, a cable transmission and broadcasting company, in June 1993. (Complaint ¶ 11.) Dujardin owned 100% of Triumph's stock. (*Id.*) Within several years of its formation, Triumph became an industry leader in designing, engineering and implementing video transmission services for a variety of clients. (*Id.*) Between 1994 and 1999, as Triumph expanded its business lines by establishing several companies to engage in related operations,[2] such as marketing cable fiber lines to cable television companies, selling and leasing video transmission equipment, broadcasting sporting events through the use of cable satellite stations, and utilizing a London-based video feed routing device, or "switch," to enable television and news networks to share feed with one another, Triumph's gross revenues burgeoned from around $1 million to approximately $17 million. (*Id.* at ¶ 12.)

### Dujardin's Search for Financing, Discussions with Liberty Media, and the Proposed Merger

In February 1999, Dujardin sought outside financing to expand his "switch" business beyond London to several other major European cities. (*Id.* at ¶ 13.) On August 26, 1999, Dujardin was introduced to the then-vice president of Liberty Media, David Beddow. (*Id.* at ¶ 15.) Beddow informed Dujardin that Liberty Media was interested in creating a subsidiary (Livewire) which would provide both production and transmission of audio and video services to clients worldwide in the film, television and advertising industries. (*Id.*) Over the next few months, Dujardin and Beddow spoke on a number of occasions regarding Beddow's vision for the subsidiary and Dujardin's desire to obtain financing. (*Id.* at ¶ 16.) During these conversations, Beddow expressed interest in providing financing to Dujardin's companies. (*Id.*)

Beddow's initial interest in providing financing soon expanded into something larger. Beddow told Dujardin during a November 8, 1999, meeting in Denver, Colorado that he was interested in acquiring the Triumph Entities for a price of two times the Triumph Entities' gross revenues. Fifty percent of the consideration would be paid in common stock of the then unformed subsidiary (Livewire) and the other fifty percent would be paid in cash (the "50–50 offer"). (*Id.* at ¶ 17.) Beddow further represented to Dujardin that, as part of the deal, Liberty Media would integrate the Triumph Entities into Livewire's proposed Network Division. Dujardin was to be made the head of this division. (*Id.*)

On November 18, 1999, Beddow, on behalf of Liberty Media and Livewire, offered to pay $32,495,694 for the Triumph Entities, or two times the combined entities' gross revenues as reflected in the Combined Statement of Income and Retained Earnings prepared by Beddow (the "Statement"). According to footnote two of the Statement, Dujardin was to head the Network Division. (*Id.* at Exh. A.) After Dujardin's receipt of the Statement and several conversations in which Beddow reiterated his promise to make Dujardin head of Livewire's Network Division,

---

1. The following facts are taken from the Complaint, the factual allegations of which are accepted as true for purposes of Defendants' motion to dismiss, as well as from the Triumph merger agreements and the various public filings cited by the parties.

2. Triumph and these other entities are referred to collectively herein as the "Triumph Entities."

Dujardin, in a letter dated November 23, 1999, accepted Liberty Media's offer to purchase the Triumph Entities. In the letter, Dujardin expressed his understanding that once the merger was completed he was to be made the head of Livewire's Network Division. (*Id.* at Exh. B.)

Beddow then notified Dujardin, by letter, dated February 3, 2000, that he wanted to restructure the proposed deal. Instead of the 50–50 offer that Dujardin had already accepted, Beddow now offered a tax-free exchange whereby Dujardin would receive eighty percent of the agreed upon consideration in Livewire stock and twenty percent in cash (the "80–20 offer"). (*Id.* at Exh. C.) In the letter, Beddow reaffirmed Liberty Media's commitment that Dujardin would head Livewire's Network Division after the merger. (*Id.*) Dujardin accepted the new terms in lieu of the original 50–50 offer and the deal went forward.

*The Triumph Acquisition and Merger Agreements*

On June 21, 2000, the parties executed the acquisition and merger agreements (the "Merger Agreements"). The Merger Agreements provided that Livewire was to acquire all of the shares of the Triumph Entities from Dujardin for aggregate consideration of approximately $29.5 million, consisting of about $5.9 million in cash and $23.6 million in Class A shares of Livewire. (*Id.* at ¶ 22.) The value of the Class A shares that Dujardin was to receive was to be based on the average of the closing price of Livewire Class A shares on the NASDAQ National Market for the 50 trading days prior to closing. The closing was made effective as of July 3, 2000. At the closing, Livewire paid the cash portion to Dujardin and calculated the number of Livewire shares to be issued in Dujardin's name to be 705,554, based on the NASDAQ 50–day average of $33.394 per share. (*Id.*)

A Pledge and Security Agreement ("Pledge Agreement") was also executed in connection with the Merger Agreements, which provided that 440,981 of Dujardin's 705,554 shares were pledged back to Livewire as security against future claims that Livewire might have for breach of certain warranties and representations made in the Merger Agreements. (*Id.* at ¶ 23.) In addition, 117,595 of Dujardin's shares were to be held back from the consideration paid to Dujardin pursuant to certain "Earnout" provisions of the Merger Agreements. Payment of the Earnout amounts was dependent on Triumph meeting certain gross revenue targets set forth in a business plan for fiscal years 2000 and 2001. (*Id.* at ¶ 24.) According to the Earnout Provisions, the Earnout amounts, plus any dividends, interest or other earnings, were to be paid to Dujardin upon his termination unless he voluntarily terminated his employment with Triumph or was terminated for certain specific cause-based reasons. (*Id.* at ¶ 25.) The Pledge Agreement included a similar provision requiring that the pledged shares be paid to Dujardin if he was terminated other than for cause.

The Merger Agreements also include an integration clause, which provides as follows:

> This Agreement, the Loan Agreement and the Other Triumph Agreements ... constitute the entire agreement between the parties and supersede all prior agreements and understandings, oral and written, between the parties with respect to the subject matter hereof and thereof.

(Agreement and Plan of Merger, dated as of June 21, 2000, Declaration of Barry H. Goldstein, Esq. ("Goldstein Decl."), Exh. A at § 9.4.)

*Defendants' Alleged Misrepresentations and Contractual Breaches*

Dujardin was never made head of Livewire's Network Division. When it became apparent to Dujardin in the months following the closing that no steps were being taken to make him head of the Network Division, he sent Beddow several e-mails inquiring about the status of Beddow's promise. Beddow responded that Liberty Media and Livewire still intended to make Dujardin head of the division and urged him to be patient. (*Id.* at ¶ 27.) Despite the assurances, it soon became clear to Dujardin that no one at Livewire other than Beddow was even discussing the issue, and eventually even Beddow began avoiding Dujardin's inquiries. It was also becoming increasingly apparent to Dujardin that the Triumph Entities were not being integrated or managed in a coordinated fashion. (*Id.* at ¶ 28.) The Triumph Entities, thus, were being operated in a manner different than Beddow represented they would be at the time of the merger, destroying the synergies that had given Livewire its value at the time of the merger and contributing to the downward spiral of Livewire's stock price. (*Id.* at ¶ 29.) In addition, in 2001, Livewire reneged on its promise to provide up to $6.5 million in financing to Triumph over a two-year period, thus seriously impairing Dujardin's ability to meet the targets set forth in the business plan. (*Id.* at ¶ 30.)

In August 2001, Dujardin inquired about the possibility of buying back Triumph. Dujardin met with Livewire representatives and was told that he was being put on "gardening leave." (*Id.* at ¶¶ 31–32.) The representatives told him not to report to work and acknowledged that he was being constructively terminated. The day after the meeting, Dujardin's counsel informed Livewire by letter that Dujardin understood Livewire's actions to mean that he was being terminated from employment at Triumph and Livewire and that, because such termination was without cause, he was entitled to immediate delivery of the stock certificates representing all of the Earnout amounts and pledged securities according to the terms of the Pledge Agreement and Merger Agreements. (*Id.* at ¶ 33.) Dujardin alleges that, as of the filing of the Complaint, Defendants had not honored either of these obligations.

In addition, Dujardin alleges that, prior to entering into the Merger Agreements, Defendants hatched a plan whereby Liberty Media would purchase businesses and/or assets worth hundreds of millions of dollars, and would then contribute those businesses and/or assets to Livewire in exchange for millions of shares of Livewire common stock at predetermined prices that it knew were likely to be significantly lower than the market price of the shares at the time such transactions were completed. (*Id.* at ¶ 34.) Dujardin contends that Defendants failed to disclose to him that they were engaging in these related-party transactions prior to the execution of the Merger Agreements.

Dujardin identifies three transactions that he contends reveal a pattern of conduct intended "to mislead and confuse" Livewire shareholders, including Dujardin, as to the true value of Livewire's common stock. (*Id.* at ¶ 36.) Such conduct, Dujardin maintains, misled him into believing that the market price of the Livewire shares he received pursuant to the Merger Agreements reflected the shares' true value such that he was actually receiving consideration pursuant to the Merger Agreements equal to that on which the parties had agreed. (*Id.* at ¶ 34.) Dujardin points to the following three transactions.

On June 9, 2000, a Liberty Media subsidiary merged into Todd–AO Corporation

("Todd–AO"). The surviving entity, Todd–AO, would later become Livewire. (*Id.* at ¶ 37.) On June 9, 2000, Liberty Media, which had already acquired the assets of Four Media Company ("4MC"), contributed those assets to Livewire in exchange for a large amount of Livewire Class B common stock. Under the exchange ratio used for the transaction, Liberty Media and Livewire valued Livewire's shares at about $18.18 per share, which was about 30.6% less per share than the closing price of Todd–AO Class A common stock on June 9, 2000.[3] (*Id.* at ¶ 38.) According to the Complaint, neither Liberty Media nor Livewire told Dujardin of the terms of these transactions even though they were agreed upon prior to the effective date of the Merger Agreements. (*Id.* at ¶ 39.)

In addition, on June 10, 2000, Liberty Media entered into a credit facility with Livewire whereby it agreed to extend up to $125 million in financing to Livewire at an interest rate of 4% per annum, the principal of which was to be convertible to Livewire Class B common stock at a price of $13 per share, a price that was about 73% less than the closing price of Livewire Class A common stock on the first trading day after June 10, 2000. (*Id.* at ¶ 40.) Again, Dujardin alleges that neither Defendant informed him of the terms of the credit facility even though they were agreed upon prior to the effective date of the Merger Agreements. (*Id.* at ¶ 41.)

On July 19, 2000, Liberty Media purchased certain assets of SounDelux Entertainment Group, Inc. ("SounDelux") in exchange for $90 million in cash. Liberty Media then contributed those assets to Livewire for 8,181,818 shares of Livewire Class B common stock. Under the exchange ratio used in the transaction, Lib-

erty Mutual and Livewire valued the shares at approximately $11.00 per share, which was 84% less than the closing price of Livewire Class A common stock on July 19, 2000. (*Id.* at ¶ 42.) Once again, Dujardin contends that the terms of the deal were never disclosed to him despite the fact that they were agreed to before the effective date of the Merger Agreements. (*Id.* at ¶ 43.)

Dujardin further alleges that Livewire's disclosure in its Form 10–Q report filed on November 14, 2000, of a transaction in which Liberty Media had entered into a merger agreement on July 25, 2000, to acquire all of the stock of Video Services Corporation ("VSC"), and then agreed on the same day to contribute VSC to Livewire, subject to the approval of Livewire's Board, in exchange for 4.6 million shares of Livewire Class B common stock valued at 38% more than the closing price of Livewire Class A common stock on November 8, 2000, was designed to counter any suggestion that Defendants had engaged in a scheme to deal in Livewire shares below their prevailing market price. (*Id.* at ¶¶ 44–46.)

A subsequent disclosure, in January 2001, revealed that the VSC acquisition and subsequent contribution to Livewire were completed on December 22, 2000, under terms that were substantially less favorable to Livewire than those described in the November 2000 Form 10–Q. The January 2001 disclosure further indicated that, also on December 22, 2000, the Liberty Media–Livewire credit facility described above was amended so that the maximum amount of financing was upped to $213 million, the interest rate was increased to 10%, and the conversion price of debt into

---

**3.** Plaintiff contends that Livewire Class A and Class B shares are identical economically. (*Id.* at ¶ 38.)

Class B shares was to be $10 per share. (*Id.* at ¶¶ 47–48.)

*Defendants' Contention that the Relevant Terms of these Transactions Were Disclosed in Various Public Filings*

Defendants argue that the relevant terms of the 4MC, credit facility and Soun-Delux transactions were disclosed in various public filings that were available prior to the execution of the Merger Agreements. On May 5, 2000, Defendants filed a Post–Merger Business Combinations Agreement in which the following terms of the 4MC transaction were disclosed:

"Todd/4MC Consideration" means a number of shares of [Livewire] Class B Common Stock equal to the sum of the following:

(a) 8,417, 421 (i.e., 3,176,385 shares of [Liberty Media Tracking Stock] to be issued in the 4MC Merger, times the agreed ratio of 2.65 shares of [Livewire] Common Stock for each share of [Liberty Media Tracking Stock], plus

(b) 5,896,296 (i.e., $123,085,181 the cash component of the aggregate 4MC Merger consideration), divided by $20.875 (the closing price of [Todd–AO] on December 6, 1999), plus

(c) 1,994,767 (i.e., 1,936,779 the number of [Liberty Media Tracking Stock] shares required to satisfy the 4MC options outstanding on December 6, 1999), times $21.50 (the agreed average in-the-money amount), divided by $20.875 (the

closing price of [Todd–AO] on December 6, 1999, plus

(d) the 4MC Warrant Value divided by the [Todd–AO] Average Closing Price. (Post–Merger Business Combinations Agreement, Goldstein Decl., Exh. H, Annex C, § 1.14.) This disclosure was repeated in three other public filings available prior to the execution of the Merger Agreements.[4]

On December 22, 1999, Livewire, then Todd–AO, filed a Form 8–K which described the credit facility as follows:

Immediately following the [Todd–AO Merger], [Livewire] and Liberty [Media] will enter into a convertible debt facility agreement in such form as [Livewire] and Liberty [Media] shall mutually agree .... The Convertible Debt Facility Agreement shall provide for aggregate credit commitments of $125 million, drawable at the option of [Livewire] in whole or in part at any time during the 48–month period following the Closing Date .... The Convertible Loans will bear interest at 4.00% per annum ... and will be convertible at the option of the holder, in whole or in part, at any time prior to maturity into shares of [Livewire] Class B Stock, at a conversion price of $13.00 per share ....

Todd–AO Form 8–K, filed on December 22, 1999, Goldstein Decl., Exh. D, Exh. 1, § 2.9. During the six months prior to the execution of the Merger Agreements, Defendants repeated this disclosure in at least five separate public filings.[5]

---

**4.** *See* Todd–AO Merger Proxy Statement, dated May 8, 2000, Goldstein Decl., Exh. I, Annex C, § 1.14; Liberty Media Schedule 13D/A filed in respect of Todd–AO, filed June 7, 2000, Goldstein Decl., Exh. J, Exh. 7(c), § 1.14; Livewire Form 8–K, filed June 13, 2000, Goldstein Decl., Exh. L, Exh. 99.4, § 1.14.

**5.** *See* Liberty Media Schedule 13D in respect of Todd–AO, filed January 20, 2000, Goldstein

Decl., Exh. E, Exh. 7(c), § 2.9; Liberty Media Schedule 13D/A in respect of Todd A–O, filed January 20, 2000, Goldstein Decl., Exh. F, Exh. 7(c), § 2.9; Form S–4, filed May 5, 2000, for the Todd–AO Merger, Goldstein Decl., Exh. H, Annex A, § 2.9; Todd A–O Merger Proxy Statement, dated May 8, 2000, Goldstein Decl., Exh. I, Annex A, § 2.9; Livewire Form 8–K, filed June 13, 2000, Goldstein Decl., Exh. L, Exh. 99.3, § 2.9.

As to the SounDelux transaction, on March 27, 2000, Liberty Media filed a Form 10–K which disclosed its intention to acquire and contribute to Livewire, then Todd–AO, SounDelux's business and operations "in exchange for additional shares of voting stock of Todd[-AO]." Liberty Media Form 10–K, filed on March 27, 2000, Goldstein Decl., Exh. G at 6. In addition, Defendants disclosed in their May 5, 2000, Form S–4 for the Todd–AO Merger and in their May 8, 2000, Todd–AO Merger Proxy Statement that it estimated "the number of shares of [Livewire] Class B Common Stock to be issued in the SounDelux business combination to be approximately 11,-668,000," and that Liberty Media and Livewire had agreed upon an exchange ratio of 3.1 Livewire shares for each share of Liberty Media tracking stock. Form S–4 for Todd–AO Merger, dated May 5, 2000, Goldstein Decl., Exh. H at 26, 83–84; Todd–AO Merger Proxy Statement, dated May 8, 2000, Goldstein Decl., Exh. I, at 26, 83–84.

The parties subsequently renegotiated the SounDelux transaction, which did not close until just under one month after the execution of the Merger Agreements. The fact that Liberty Media, Livewire and SounDelux were renegotiating the transaction was publicly disclosed prior to the execution of the Merger Agreements in Todd–AO's June 9, 2000, Form 8–K, Goldstein Decl., Exh. K, Exh. 1, and in Livewire's June 13, 2000, Form 8–K, Goldstein Decl., Exh. L at 2 and Exh. 99.1.

*Plaintiff's Claims*

Plaintiff asserts fraud claims against Defendants Livewire and Liberty Media under Section 10(b) of the Securities Exchange Act and Rule 10b–5 (Count I) and for common law fraud (Count III) based on two theories. First, Plaintiff alleges that Liberty Media and Livewire engaged in a conspiracy to mislead and conceal material information from Plaintiff by participating in the above-described series of transactions between themselves in which shares of Livewire were transferred at prices substantially below their then-prevailing market price. These transactions, Plaintiff maintains, had the intended effect of preventing Plaintiff from learning the true and fair value of the Livewire shares he received under the Merger Agreements. Plaintiff contends that Defendants did not disclose their plans to him and that, had he known of them, he would not have accepted Livewire's common stock as consideration for the Merger Agreements, or, at least, not at the valuation provided for in the Merger Agreements.

Second, Plaintiff alleges that Defendants misled him into believing that Defendants intended to make Plaintiff head of the Livewire's Network Division. Plaintiff further contends that he would not have agreed to the enter into the Merger Agreements at all, or, at least, would not have agreed to the valuation of Livewire shares he received under the Merger Agreements, if he had known that he would not be made Network Division head.

In Count II, Plaintiff asserts that Liberty Media is individually liable as a control person under Section 20(a) of the Securities Exchange Act for causing or failing to prevent the alleged wrongful conduct described in the Complaint. In Count IV, Plaintiff asserts a claim of negligent misrepresentation against both Defendants in the event that it is determined that the alleged misstatements and omissions described above were not intentionally made. In Count V, Plaintiff asserts a breach of contract claim against Livewire for failure to pay in full the Earnout amounts allegedly owed to him under the Merger Agreement's Earnout Provisions. And, in Count VI, Plaintiff asserts a breach of contract claim against Livewire for failing to mak-

ing Plaintiff head of the Network Division, which according to Plaintiff, was part of the consideration for Dujardin entering into the Merger Agreements.

## DISCUSSION

### Liberty Media and Livewire's Motion to Dismiss

#### Rule 12(b)(6) and 9(b) Standards

In deciding a motion to dismiss for failure to state a claim pursuant to Fed. R.Civ.P. 12(b)(6), "the court must accept as true all of the well pleaded facts and consider those facts in the light most favorable to the plaintiff." *Hudson Valley Black Press v. Internal Revenue Service,* 307 F.Supp.2d 543, 545 (S.D.N.Y.2004). The issue is whether the plaintiff is entitled to offer evidence to support the claims. *Id.* A complaint should not be dismissed " 'unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief.' " *Branum v. Clark,* 927 F.2d 698, 705 (2d Cir.1991) (quoting *Conley v. Gibson,* 355 U.S. 41, 45–46, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957)).

In addition, a court may consider, in deciding a motion to dismiss, documents which are integral to the complaint or are incorporated by reference in the pleadings. *See Rizzo v. The MacManus Group, Inc.,* 158 F.Supp.2d 297, 301 (S.D.N.Y.2001) (a court may consider "documents that are incorporated by reference in the pleadings" when deciding a motion to dismiss under Rule 12(b)(6)); *Sable v. Southmark/Envicon Capital Corp.,* 819 F.Supp. 324, 328 (S.D.N.Y.1993) (quoting *I. Meyer Pincus & Assocs., P.C. v. Oppenheimer & Co.,* 936 F.2d 759, 762 (2d Cir.1991)) (in deciding a motion to dismiss, a court "may consider documents which form the basis of allegations of fraud if the documents are 'integral to the complaint' ").

Fed.R.Civ.P. 9(b) refers to fraud actions generally and provides that, "[i]n all averments of fraud or mistake, the circumstances constituting fraud or mistake shall be stated with particularity." Particularity requires the plaintiff to "(1) specify the statements that the plaintiff contends were fraudulent, (2) identify the speaker, (3) state where and when the statements were made, and (4) explain why the statements were fraudulent." *Anatian v. Coutts Bank (Switzerland) Ltd.,* 193 F.3d 85, 88 (2d Cir.1999) (internal quotation marks and citation omitted).

#### Dujardin's Fraud Claims Under Section 10(b) of the Securities Exchange Act and Rule 10b–5

To state a fraud claim under Section 10(b), a plaintiff must allege "(1) material misstatements or omissions, (2) indicating an intent to deceive or defraud, (3) in connection with the sale or purchase of a security, (4) upon which the [plaintiff] reasonably relied to [his] detriment." *Sable,* 819 F.Supp. at 333. Dujardin's fraud claims are premised on two separate theories of alleged wrongful conduct. First, Dujardin contends that Defendants engaged in a scheme to mislead and conceal material information from him, thereby preventing him from learning the true and fair value of the Livewire stock he received under the Merger Agreements. Specifically, Dujardin alleges that Defendants executed and failed to adequately disclose a plan by which Liberty Media would purchase businesses and/or assets which it would then contribute to Livewire in return for Livewire common stock valued at prices substantially below the prevailing NASDAQ trading price for such stock. According to Dujardin, he would not have accepted the Livewire stock at the valuation provided for in the Merger Agreements as consideration for his sale of the Triumph Entities had he known of these

transactions. (Compl. ¶¶ 52–58.) Second, Dujardin contends that Defendants misled him into believing that, after the merger, he would be made head of Livewire's Network Division. (*Id.* at ¶ 59.) The Court will consider each of these theories in turn.

*Defendants' Alleged Scheme to Conceal the Fair and True Value of Livewire Stock*

Defendants contend that Dujardin's fraud claim under the federal securities laws based on Defendants' alleged scheme to engage in transactions designed to conceal the fair and true value of Livewire stock should be dismissed because 1) the allegedly concealed transactions were adequately disclosed in various public filings, 2) Dujardin has failed to satisfy all of the elements of a Section 10(b) claim, 3) Dujardin's claim is time-barred, 4) the Complaint fails to allege facts sufficient to give rise to a duty to disclose and 5) the Complaint fails to particularize any misstatements concerning Livewire's stock price and therefore are not plead with the particularity required by the Private Securities Litigation Reform Act ("PSLRA") and Rule 9(b). The Court finds that dismissal of the Complaint as to that particular claim is appropriate based on several of these theories.

First, Defendants argue that the terms of the three transactions highlighted in the Complaint were included in or are readily ascertainable from information contained in various public filings made available prior to the date that the Triumph merger became effective. Thus, Defendants maintain, there was no concealment of the terms of these transactions and the alleged fraud with respect to these transactions could not have occurred.

Dujardin argues that the disclosures referenced by Defendants were inadequate because they were fragmented, voluminous, and contained no information about the intended purpose and potential effects of Defendants' purported scheme. Dujardin further contends that the nature of the alleged scheme would only become evident after someone with expertise in accounting spent hours reviewing the various filings combined with additional filings only made available after the effective date of the merger.

■ "The naked assertion of concealment of material facts which is contradicted by published documents which expressly set forth the very facts allegedly concealed is insufficient to constitute actionable fraud." *Sable,* 819 F.Supp. at 333 (internal quotation marks and citations omitted). That said, "[s]ome statements, although literally accurate, can become, through their context and manner of presentation, devices which mislead investors. For that reason, the disclosure required by the securities laws is measured not by literal truth, but by the ability of the material to accurately inform rather than mislead prospective buyers." *McMahan & Co. v. Wherehouse Entm't, Inc.,* 900 F.2d 576, 579 (2d Cir.1990), *cert. denied,* 501 U.S. 1249, 111 S.Ct. 2887, 115 L.Ed.2d 1052 (1991).

■ Here, Defendants disclosed in a number of public filings made available prior to the execution of the Merger Agreements material information concerning all three of the transactions that were allegedly concealed and designed to mislead Dujardin as to the true and fair value of Livewire stock. While information relating to the three transactions is scattered among various filings, Defendants have proffered evidence that much of the allegedly concealed information concerning all three of the highlighted transactions was available in a single source—the May 8, 2000, Todd–AO Merger Proxy Statement. (Goldstein Decl., Exh. I.)

With respect to the 4MC transaction, Plaintiff contends that Defendants failed to disclose the terms of Liberty Media's acquisition of 4MC's stock and contribution of that stock to Livewire, or that the parties had engaged in a related-party transaction in which Livewire shares were being acquired by Liberty Media at a share value significantly below the then-prevailing market price for those shares. However, as detailed above, Defendants' public disclosures made available prior to the execution of the Merger Agreements contain information sufficient for Plaintiff to have ascertained that Defendants had engaged in a related-party transaction in which Liberty Media received Livewire stock at a price below market value.

The Post Merger Business Combinations Agreement, filed on May 5, 2000, as well as three subsequent filings by Defendants, all made available prior to the execution of the Merger Agreements, discuss Liberty Media's planned acquisition of 4MC's stock, and also state the relevant terms of Liberty Media's contribution of the 4MC stock it acquired to Livewire (then Todd–AO). In those filings, Defendants disclosed that the value of the Livewire stock that will be paid to Liberty Media in return for 4MC's stock will be arrived at using an "exchange ratio" of 2.65 shares of Livewire stock for each share of Liberty Media stock. With such information, it would have been possible to discern whether Livewire's stock was being valued at a below-market level simply by looking up the market value of Liberty Media stock on the relevant date and then dividing that value by 2.65 to arrive at the price at which Livewire's stock was being valued. A simple comparison of that price with the market value of Livewire stock on the date in question would have enabled Plaintiff to ascertain whether the valuation of the Livewire stock being paid to Liberty

Media market value was at, above or below market value.

As to the credit facility, Plaintiff alleges that Defendants failed to disclose the terms of the credit facility or the fact that Defendants had engaged in a related-party transaction in which Liberty Media had the right to convert its debt under the credit facility into Livewire stock at a price well below the market value of that stock at the time that the Merger Agreements were executed. However, Livewire's Form 8–K, filed on December 22, 1999, as well as five other public filings filed prior to the execution of the Merger Agreements, detailed the relevant terms of the credit facility, disclosing that Livewire and Liberty Media were entering into a credit facility allowing for credit commitments of $125 million and bearing interest at 4.00% per annum. The filings also disclosed that the loans would be convertible into Livewire shares at the price of $13.00 per share—a value which could easily have been compared to the market price of Livewire stock on the date when Plaintiff entered into the Merger Agreements.

With respect to the SounDelux transaction, which closed on July 19, 2000, a little less than one month *after* the execution of the Merger Agreements, Plaintiff alleges that Defendants failed to disclose the terms of Liberty Media's acquisition of SounDelux, its contribution of SounDelux to Livewire, or the fact that Defendants engaged in a related-party transaction in which Liberty Media was acquiring Livewire shares at a value significantly below the market price of Livewire shares at the time of the transaction. However, as noted above, Liberty Media's Form 10–K, filed on March 27, 2000, disclosed its intention to acquire SounDelux's assets and contribute them to Livewire in exchange for additional shares of Livewire stock, and both the May 5, 2000, Form S–4 for

the Todd–AO Merger and the May 8, 2000, Todd–AO Merger Proxy Statement disclosed that the number of Livewire shares to be issued in the SounDelux business combination was approximately 11,668,000, and that Liberty Media and Livewire had agreed upon an exchange ratio of 3.1 Livewire shares for each share of Liberty Media tracking stock. Plaintiff could have discovered that the resulting valuation of Livewire stock was below market value by looking up the value of Liberty Media stock on the day of the transaction, dividing it by 3.1, and then comparing the result with the market value of Livewire stock on the date in question.

It is important to note that the terms disclosed were not the terms of the eventual deal (the terms of the deal were renegotiated subsequent to the disclosures), which did not close until after the execution of the Merger Agreements and resulted in a below market valuation of Livewire's shares. However, the fact that Liberty Media, Livewire and SounDelux were renegotiating the transaction *was* publicly disclosed prior to the execution of the Merger Agreements, although not all of the terms of the revised transaction were disclosed. The Court concludes that, even though the precise terms of the eventual transaction were not disclosed to Plaintiff prior to the execution of the Merger Agreements, Defendants' prior filings did put Plaintiff on inquiry notice before he signed the Merger Agreements that a transaction involving the Defendants and SounDelux, in which Livewire's shares were to be transferred at below market value, was in the process of being negotiated.

The Court finds that Defendants, in their various public filings, disclosed facts sufficient for Plaintiff to have ascertained the allegedly concealed information about the terms and nature of the 4MC, credit facility and SounDelux transactions, including the facts that Liberty Media and Livewire were engaging in transactions with one another pursuant to which Livewire stock was being valued at prices substantially below market value. Further, the context and manner of presentation of those disclosures were sufficient to adequately inform a reasonable investor of the potential combined effects of the various transactions on the value of Livewire's stock, particularly an investor of Plaintiff's sophistication who, given that he was considering entering into a deal to sell his own company in exchange for a large amount of stock in another entity, could reasonably be expected to consider as a whole the various public filings concerning that other entity's finances and financial commitments. Plaintiff thus has failed to allege material misrepresentations or omissions sufficient to state a securities fraud claim because Plaintiff's claim concerning the related-party transactions is premised on facts that were adequately disclosed in the pre-merger public filings described above. *See Sable*, 819 F.Supp. at 333. Thus, the Court finds that, even drawing all reasonable inferences in Plaintiff's favor, there is no set of facts consistent with the allegations in the Complaint that would entitle Plaintiff to relief on his Section 10(b) fraud claims relating to Defendants' alleged scheme to conceal material information relating to the 4MC, credit facility and SounDelux transactions in order to prevent Plaintiff from learning the true and fair value of the Livewire stock he received under the Merger Agreements.

■ Defendants also contend that Dujardin's 10(b) claim based on the allegedly concealed transactions is time-barred because it was not brought within one year of the time the fraud reasonably should have been discovered. The parties agree that the applicable statute of limitations for

bringing a fraud claim is one year from the fraud's discovery. *See Dodds v. Cigna Sec., Inc.,* 12 F.3d 346, 349 (2d Cir.1993). Defendants contend that the disclosure of information concerning the three transactions in the various pre-merger filings put Dujardin on inquiry notice of the facts constituting the alleged fraud more than one year before he filed the Complaint. "A plaintiff in a federal securities case will be deemed to have discovered fraud for purposes of triggering the statute of limitations when a reasonable investor of ordinary intelligence would have discovered the existence of the fraud." *Id.* at 350. Dujardin argues that he could not reasonably have been aware of the alleged scheme to defraud until a January 2001 public disclosure revealed Defendants' true intentions.

■ The Court finds that the disclosures in Defendants' pre-merger filings described above, when viewed as a whole and construed in the light most favorable to Plaintiff, were sufficient to put Plaintiff on inquiry notice of the facts constituting the alleged fraud. These disclosures were filed between December 22, 1999, and June 13, 2000, and the Complaint was filed in the instant case on November 30, 2001. Thus, since Plaintiff was on inquiry notice of the facts constituting the alleged fraud more than one year before the filing of the Complaint, Plaintiff's Section 10(b) fraud claim is barred by the statute of limitations.

■ Finally, Defendants also contend that Dujardin has not adequately pled facts indicating that Defendants were under a duty to disclose the allegedly concealed information to Plaintiff. Under the federal securities laws, "a failure to disclose material information is actionable only when the defendant had an affirmative duty to disclose these facts." *Castellano v. Young & Rubicam, Inc.,* 257 F.3d 171, 179 (2d Cir.2001) (citing *In re Time Warner Inc. Sec. Litig.,* 9 F.3d 259, 267 (2d Cir.1993)). "In the case of an omission, the duty to disclose generally 'arises when one party has information that the other [party] is entitled to know because of a fiduciary or other similar relation of trust and confidence between them.' " *Grandon v. Merrill Lynch & Co., Inc.,* 147 F.3d 184, 189 (2d Cir.1998) (citing *Chiarella v. United States,* 445 U.S. 222, 228, 100 S.Ct. 1108, 63 L.Ed.2d 348 (1980) (internal quotation and citation omitted)).

Here, Dujardin has failed to allege facts sufficient to demonstrate a duty to disclose on the part of Defendants. The Complaint does not allege any fiduciary or special relationship between Defendants and Plaintiff. In support of his claims, Dujardin cites cases indicating that a corporation owes a fiduciary duty to existing shareholders, but has cited no authority to support the proposition that corporations owe a fiduciary duty to a prospective stock purchaser. Plaintiff also contends, citing *Rizzo v. The MacManus Group, Inc.,* 158 F.Supp.2d 297 (S.D.N.Y.2001), that a duty to disclose arises "where one party possesses superior knowledge not available to the other and knows that the other is acting on the basis of the mistaken knowledge," and "where a party has made an inaccurate, incomplete or misleading prior disclosure." *Id.* at 301; *see also In re Canandaigua Sec. Litig.,* 944 F.Supp. 1202, 1208 (S.D.N.Y.1996). Dujardin has failed to plead facts indicating that Defendants knew he was acting on the basis of mistaken knowledge. And, although Dujardin has argued in his motion papers that Defendants' prior disclosures were misleading, he makes no allegations to that effect in the Complaint.

Therefore, for the aforementioned reasons, Dujardin's fraud claim under the federal securities laws asserted in Count I of

the Complaint based on the allegedly concealed transactions and the alleged scheme to conceal the fair and true value of Livewire's stock must be dismissed with prejudice.[6]

*Defendants' Alleged Promise to Make Dujardin Head of Livewire's Networks Division*

■ Defendants contend that Dujardin's fraud claim under the federal securities laws based on Beddow's alleged broken promise to appoint Dujardin as head of Livewire's Network Division should be dismissed because the Complaint fails to plead fraud with particularity pursuant to Fed.R.Civ.P. 9(b) in that it falls short of alleging facts sufficient to raise a strong inference of fraudulent intent as is required by the PSLRA. The Second Circuit has held that

> [t]he failure to carry out a promise made in connection with a securities transaction is normally a breach of contract. It does not constitute fraud unless, when the promise was made, the defendant secretly intended not to perform or knew that he could not perform.... Accordingly, although Rule 9(b) allows a pleader to aver intent generally, a 10b–5 complaint nevertheless must allege facts that raise a strong inference of fraudulent intent.

*Mills v. Polar Molecular Corp.*, 12 F.3d 1170, 1176 (2d Cir.1993). Like the plaintiff in *Mills*, Dujardin alleges no facts probative of Defendants' intent at the time the alleged promises were made. Dujardin only alleges that promises were made which Defendants subsequently failed to perform. The *Mills* Court, in affirming the district court's dismissal of plaintiff's Rule 10b–5 claim, declined to infer fraudulent intent from the mere fact that the

defendant had made a number of promises to register shares that were issued to plaintiff as compensation and had not performed any of them. The court noted that "[a] contract may be breached for legitimate business reasons" and "[c]ontractual breach, in and of itself, does not bespeak fraud, and generally does not give rise to tort damages." *Id.* Dujardin's Complaint must therefore be dismissed insofar as it asserts fraud claims based on the alleged promises to promote him to division head.

Defendants, however, have admitted in the course of briefing on these motions that, as of September 28, 2000, a little more than two months after the parties executed the Merger Agreements, Livewire had appointed Scott Davis as the President of the Network Division. (*See* Affidavit of Scott Davis in Supp. of Def's Motion for Sanctions ("Davis Aff.") ¶¶ 4.) The Court finds that the fact that Livewire appointed someone else to the position allegedly promised to Plaintiff as part of the consideration for the sale of his business within only two months of the consummation of that sale could be found to support a strong inference of fraudulent intent not to perform at the time the alleged promise was made. In the interests of justice, Plaintiff will be given an opportunity to amend this element of his Complaint, which does not currently include any allegations regarding the timing of the Davis hire.

■ Defendants also contend that the alleged fraudulent promise was not made "in connection with" the purchase or sale of securities. "[T]o recover on a Section 10(b) claim, a plaintiff must allege material misstatements or omissions indicating an intent to deceive or defraud *in connection*

---

**6.** The Court finds that allowing Plaintiff leave to replead would be futile in light of the aforementioned public disclosures and the Court's conclusions with respect to the applicable statute of limitations.

*with* the purchase or sale of a security." *Citibank, N.A. v. K–H Corp.*, 745 F.Supp. 899, 903 (S.D.N.Y.1990) (internal quotation marks and citation omitted) (emphasis in original). Some courts have read this requirement narrowly, finding that a plaintiff may not merely allege fraudulent acts which happen to involve securities but rather must allege fraud concerning "the fundamental *nature*" of securities or "the characteristics and attributes that would induce an investor to buy or sell the particular" securities. *Id.* Thus, according to such Courts, the "in connection with" requirement "will not be satisfied unless the misrepresentation is related to the nature or value of the securities ..." *Id.* at 904.

Other courts, however, have interpreted the requirement more broadly, finding that "[a]ny statement that is reasonably calculated to influence the average investor satisfies the 'in connection with' requirement of Rule 10b–5." *SEC v. Hasho*, 784 F.Supp. 1059, 1106 (S.D.N.Y.1992); *see also Fisk v. SuperAnnuities, Inc.*, 927 F.Supp. 718, 726 (S.D.N.Y.1996) (finding that allegation that CEO of defendant company promised to appoint plaintiff to board of directors to induce him to buy shares of defendant company was sufficient to satisfy "in connection with" requirement). The Court concludes that Plaintiff's contention that, if he had known that he would not be made head of the division, he would not have entered into the sale of his company for the amount of cash and number of shares that the parties ultimately agreed upon supports a finding that Plaintiff has pled facts sufficient to satisfy the "in connection with" requirement.

Accordingly, Defendant's motion to dismiss is granted, without prejudice to prompt amendment of the Complaint, with respect to Dujardin's Rule 10b–5 claim in Count I of the Complaint based on Bed-dow's alleged promises to make Dujardin head of Livewire's Network Division.

*Dujardin's Claim that Liberty Media Violated Section 20(a) of the Securities Exchange Act*

■ "Section 20(a) of the Exchange Act imposes secondary liability on persons who 'control' persons who commit securities fraud in violation of section 10(b) and Rule 10b–5." *Souter v. Tatro, IV*, No. 03–CV–6141 CJS, 2004 WL 1574562, at *4 (W.D.N.Y. June 21, 2004). "To make out a prima facie case under § 20(a) of the Exchange Act, a plaintiff must show a primary violation ... by the controlled person ... and control of the primary violator by the targeted defendant ..., and show that the controlling person was in some meaningful sense a culpable participant in the fraud perpetrated by the controlled person." *Ganino v. Citizens Utilities Co.*, 228 F.3d 154, 170 (2d Cir.2000) (internal quotation marks and citation omitted).

Dujardin alleges in Count Two of the Complaint that Liberty Media, Livewire's parent corporation, should be liable under Section 20(a) because of its control over Livewire and its involvement in the allegedly fraudulent conduct. Defendants contend that this Claim should be dismissed because it fails to allege an underlying primary violation, and because it fails to allege facts showing Liberty Media's culpable participation in the fraud.

With regard to Plaintiff's fraud claim based on Defendants' alleged failure to adequately disclose a plan by which Liberty Media would purchase businesses and/or assets which it would then contribute to Livewire in return for Livewire common stock valued at prices substantially below the prevailing market price for such stock, the Court has already determined, as explained above, that Plaintiff has not pled facts sufficient to show a primary violation of the securities laws.

Accordingly, Dujardin's claim under Section 20(a) is dismissed to the extent it is premised on his fraud claim based on Defendants' alleged failure to adequately disclose their allegedly fraudulent scheme involving the below-market transactions.

As to Plaintiff's fraud claim involving Defendants' alleged promise to make Dujardin head of Livewire's Network Division, Dujardin, as noted above, can plead adequate facts to show the existence of a primary violation. Further, Dujardin alleges that at the time Beddow made the alleged promises regarding appointing Dujardin head of the Network Division, he was Vice President of Liberty Media and acting on behalf of both Liberty Media and Livewire. (Compl.¶¶ 15–21.) Thus, the Court finds that Plaintiff can allege facts sufficient to show Liberty Media's culpable participation in the fraud. Thus, Defendants' motion to dismiss will be granted as to Dujardin's claim under Section 20(a) to the extent that claim is premised on Defendants' alleged promise to make Dujardin head of Livewire's Network Division as part of the consideration for the sale of Dujardin's business, but without prejudice to Plaintiff's prompt amendment of his Complaint to allege facts concerning the Davis hire.

Therefore, Defendant's motion to dismiss is granted with prejudice as to Plaintiff's claim in Count II under Section 20(a) of the Securities Exchange Act to the extent that claim is premised on Dujardin's fraud claim based on Defendants' alleged failure to adequately disclose their allegedly fraudulent scheme involving the related party below-market transactions, but is granted without prejudice to the extent Plaintiff's Section 20(a) claim is premised on Defendants' alleged promise to make Dujardin head of Livewire's Network Division as part of the consideration for the sale of Dujardin's business.

### Dujardin's Common Law Fraud Claim

The parties agree that, except for the applicable statute of limitations and the "in connection with" requirement, Dujardin's common law and Section 10(b) fraud claims share the same elements and are similarly subject to Rule 9(b)'s particularity requirements. Therefore, the analysis set forth above with regard to Dujardin's federal securities claims applies with full force to Dujardin's common law fraud claims.

Accordingly, and for the reasons stated above, Defendants' motion to dismiss is granted with prejudice as to Dujardin's common law fraud claim in Count III of the Complaint based on Defendants' alleged failure to adequately disclose their allegedly fraudulent scheme involving the related party below-market transactions, and Defendants' motion to dismiss is granted without prejudice as to Dujardin's common law fraud claim in Count III predicated on Defendants' alleged promise to make Dujardin head of Livewire's Network Division.

### Dujardin's Negligent Misrepresentation Claim

Defendants also contend that Dujardin's state law negligent misrepresentation claim alleged in Count IV should be dismissed. Defendants argue that New York's Martin Act dictates required disclosures with respect to securities sales and does not allow private rights of action, thus precluding Dujardin's common law negligent misrepresentation claim. The Second Circuit, in *Castellano*, 257 F.3d at 190–91, although addressing a breach of fiduciary duty claim and refusing to reach directly plaintiff's negligent misrepresentation claim because no issue with respect to that claim was raised on appeal, adopted the rule articulated in *Horn v. 440 E. 57th Co.*, 151 A.D.2d 112, 547 N.Y.S.2d 1, 5 (1st Dep't. 1989), that the Martin Act, which prohibits fraudulent and deceitful practices

in the distribution and sale of securities, preempts any common law claims within its purview. Sustaining a claim for negligent misrepresentation, the *Horn* Court determined, would effectively permit a private action under the Martin Act, which the New York State Court of Appeals had already determined would be impermissible. *See CPC Int'l Inc. v. McKesson Corp.*, 70 N.Y.2d 268, 519 N.Y.S.2d 804, 514 N.E.2d 116, 118–119 (1987). As Judge Sand pointed out in *Nanopierce Tech., Inc. v. Southridge Capital Management LLC*, No. 02 Civ. 0767(LBS), 2003 WL 22052894 (S.D.N.Y. Sept.2, 2003), "[t]he federal district courts that have examined the question have reached the same result with near unanimity."[7] *Nanopierce*, 2003 WL 22052894 at *3 (citing numerous examples).

Courts have drawn a distinction between common law fraud claims on the one hand, which have been allowed to proceed, and negligent misrepresentation and breach of fiduciary duty claims on the other, which have been found to be preempted by the Martin Act. According to Judge Sand, the courts that have made this distinction

> have offered a persuasive justification for so doing: the latter two causes of action, like the Martin Act itself, do not require proof of deceitful intent; common law fraud, however, does. Courts concerned with preserving the Attorney General's exclusive domain therefore preclude claims which essentially mimic the Martin Act, but permit common law fraud claims, which require an additional element.

*Nanopierce*, 2003 WL 22052894, at *4 (citing cases).

This Court concurs with the analysis set forth in *Castellano, Nanopierce,* and the other decisions finding negligent misrepresentation and breach of fiduciary duty claims preempted. Accordingly, the Court finds that Dujardin's cause of action for negligent misrepresentation is precluded by the Martin Act.

As an alternative ground for dismissal, Defendants also argue that Dujardin's negligent misrepresentation claim should be dismissed to the extent it is predicated on Beddow's alleged promise to make Dujardin head of Livewire's Network Division after the merger because a promise of future performance cannot support a negligent misrepresentation claim. To be actionable under New York law, "the alleged misrepresentation must be factual in nature and not promissory or relating to future events that might never come to fruition." *Hydro Investors, Inc. v. Trafalgar Power Inc.*, 227 F.3d 8, 20–21 (2d Cir.2000). Therefore, to the extent Dujardin brings a negligent misrepresentation claim predicated on the alleged fraudulent promise to make him head of the Networks Division, that claim would be dismissed even if it were not preempted.

Accordingly, for the reasons stated above, Dujardin's negligent misrepresentation claim asserted in Count IV of the Complaint will be dismissed.

*Dujardin's Breach of Contract Claim Arising from Defendants' Failure to Appoint Him Head of Livewire's Network Division*

In Count VI of the Complaint, Dujardin asserts a breach of contract claim against Livewire for failing to live up to Beddow's alleged promise to make Dujardin head of Livewire's Network Division as part of the consideration for Dujardin entering into

---

**7.** *Cf. Scalp & Blade, Inc. v. Advest, Inc.*, 281 A.D.2d 882, 722 N.Y.S.2d 639, 640 (4th Dep't 2001); *Cromer Fin. Ltd. v. Berger*, No. 00 CIV. 2498, 2001 WL 1112548, at *3–4 (S.D.N.Y. Sept.19, 2001).

the Merger Agreements. Defendants move to dismiss the claim on the grounds that the alleged promise is too indefinite to support an enforceable contract, and that the integration clause in the Merger Agreements bars evidence of any additional merger consideration other than that provided for therein.

▇▇▇▇ Under New York law, an oral agreement shall only be received to vary the terms of a written contract if at least three conditions exist:

'(1) The agreement must in form be a collateral one; (2) it must not contradict express or implied provisions of the written contract; (3) it must be one that parties would not ordinarily be expected to embody in the writing, or, put in another way, an inspection of the written contract, read in the light of surrounding circumstances, must not indicate that the writing appears 'to contain the engagements of the parties, and to define the object and measure the extent of such engagement.' Or, again, it must not be so clearly connected with the principal transaction as to be part and parcel of it.'

*Gem Corrugated Box Corp. v. National Kraft Container Corp.,* 427 F.2d 499, 502–03 (2d Cir.1970) (quoting *Mitchill v. Lath,* 247 N.Y. 377, 380–81, 160 N.E. 646 (N.Y. 1928)).

▇▇▇▇▇▇ It is undisputed that the Merger Agreements include no mention of the alleged promise to make Dujardin head of Livewire's Network Division, and do include an integration clause, which provides as follows:

This Agreement, the Loan Agreement and the Other Triumph Agreements … constitute the entire agreement between the parties and supersede all prior agreements and understandings, oral and written, between the parties with respect to the subject matter hereof and thereof.

(Goldstein Decl, Exh. A at § 9.4.) It is generally understood that the purpose of an integration clause "is to require full application of the parol evidence rule in order to bar the introduction of extrinsic evidence to vary or contradict the terms of the writing." *Primex Int'l Corp. v. Wal-Mart Stores,* 89 N.Y.2d 594, 600, 657 N.Y.S.2d 385, 679 N.E.2d 624 (N.Y.1997). Plaintiff, in arguing that the parol evidence rule should not be applied to bar evidence of the alleged employment agreement here, points to *Lee v. Joseph E. Seagram & Sons, Inc.,* 552 F.2d 447, 451–52 (2d Cir.1977) and *Gem Corrugated,* 427 F.2d at 503, two decisions in which the Second Circuit determined that the parol evidence rule did not bar the presentation of evidence of an alleged oral agreement that was not embodied in the parties' written contract. Both of these cases, however, are distinguishable in important respects from the case at bar.

First, in *Lee,* the written agreement at issue did not contain an integration clause. As a result, the court noted, the "strong presumption of exclusion" that would have resulted from "the existence of a detailed integration clause" was absent. *Lee,* 552 F.2d at 452. Second, although the *Lee* Court noted that, in complex settings, an "oral agreement can be treated as separate and independent of the written agreements even though the written contract contains a strong integration clause," *id.* at 451–52, it relies on *Gem Corrugated* for this proposition. The complex situation at issue in *Gem Corrugated* is distinguishable from the case at bar in that the written agreement in which the integration clause was contained in that case (a requirements contract to purchase corrugated box materials from defendant) was the *ancillary* agreement, while the oral agreement that the court deemed to be separate, indepen-

dent and not likely to be embodied in the written contract, a stock purchase agreement, was "the vital element of the overall transaction." 427 F.2d at 503. The court determined that the parol evidence rule had no application in a situation where the oral agreement at issue, and not the written agreement containing the integration clause, was the principal transaction. *Id.* In the case at bar, Plaintiff alleges in the Complaint that "Beddow on behalf of Liberty Media and [Livewire] promised to make Dujardin head of the Network Division as part of the consideration for Dujardin entering into the Merger Agreements." (Compl.¶ 92.) Thus, it is clear that the written Merger Agreements constitute the principal transaction, while the alleged agreement to make Dujardin head of the Network Division is ancillary to that transaction.

Here, the reception of evidence of the alleged promise to make Dujardin head of the Network Division in connection with Plaintiff's breach of contract claim would contradict the integration clause providing that the Merger Agreements contain the entire agreement between the parties. The parol evidence rule applies to preclude consideration of this extrinsic evidence, which varies the terms of the Merger Agreements. Accordingly, Defendants'

motion to dismiss is granted as to Plaintiff's claim in Count VI against Defendant Livewire for breach of contract relating to Defendants' alleged promise to make Plaintiff head of Livewire's Network Division.[8]

*Dujardin's Breach of Contract Claim Regarding the Earnout Provisions*

Defendants originally moved to dismiss or stay pending arbitration Dujardin's claim in Count V of the Complaint that Livewire breached the Earnout Provisions of the Merger Agreements. However, subsequent to the conclusion of briefing on the instant motion to dismiss, the arbitration proceeding was resolved and Defendant Livewire has conceded liability with respect to Count V of the Complaint. (*See* Def's Br. In Opp. to Pl's Motion for Summ. J. on Count V of the Compl. at 7.) Thus, Defendants' motion to dismiss is denied as moot as to Count V of the Complaint.

*Dujardin's Motion for Summary Judgment As to Count V of the Complaint*

*Summary Judgment Standard*

Summary judgment is appropriate when the "pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any materi-

---

**8.** Defendants also contend that the alleged promise to make Dujardin head of the Network Division was too indefinite to support a contract claim. To state a claim in federal court for breach of contract under New York law, a complaint need only allege (1) the existence of an agreement, (2) adequate performance of the contract by the plaintiff, (3) breach of contract by the defendant, and (4) damages. *Harsco Corp. v. Segui*, 91 F.3d 337, 348 (2d Cir.1996). Defendants contend that Dujardin has not sufficiently pled facts to show that a valid contract existed because he has not specifically alleged anything about duration of the contract, agreed upon compensation, specific duties, etc. However, "[u]nder the relaxed pleading requirements

applicable in federal court ... it is enough that plaintiff comply with the requirement that the pleading put defendant on notice of the grounds for which plaintiff seeks relief." *Coddington v. Adelphi Univ.*, 45 F.Supp.2d 211, 218 (E.D.N.Y.1999) (citing Fed.R.Civ.P. 8(a)(2)). Here, Plaintiff has pled that Defendants made him a *promise that he would be* made head of the Networks Division as part of the consideration for the sale of his company. The Court finds that this is sufficient to show the existence of a contract. Accordingly, the Court finds that dismissal of Count VI of the Complaint on the ground that the alleged promise was too indefinite would be inappropriate.

al fact and the moving party is entitled to judgment as a matter of law." Fed. R.Civ.P. 56(c). In resolving a motion for summary judgment, the Court must assess the record in the light most favorable to the nonmoving party, and draw all reasonable inferences in the nonmovant's favor. *See Delaware & Hudson Ry. Co. v. Consol. Rail Corp.*, 902 F.2d 174, 177 (2d Cir.1990). A fact is material "if it might affect the outcome of the suit under the governing law." *Holtz v. Rockefeller & Co.* 258 F.3d 62, 69 (2d Cir.2001) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986)). A fact is genuinely at issue if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.* "Summary judgment is appropriate when, after drawing all reasonable inferences in favor of the party against whom summary judgment is sought, no reasonable trier of fact could find in favor of the nonmoving party." *Leon v. Murphy*, 988 F.2d 303, 308 (2d Cir.1993) (internal quotation marks and citations omitted).

*Dujardin's Argument That He Is Entitled to Summary Judgment As To Count Five Due to the Collateral Estoppel Effect of the Arbitrator's Order and Award*

In Count V of the Complaint, Dujardin asserts a breach of contract claim against Defendant Livewire in connection with Livewire's alleged failure to release certain shares [9] of Livewire stock that were initially held back from Dujardin according to the terms of the Merger Agreements. According to the Merger Agreements, payment of the shares in question, which are referred to in the Complaint as "Earnout Shares," was contingent upon Triumph meeting certain gross revenues targets for fiscal years 2000 and 2001. Section 205(f)

of the Merger Agreements provided that Livewire was to deliver any unpaid Earnout Shares in the event that Dujardin was terminated without cause.

The Pledge Agreement contained similar provisions whereby Dujardin pledged 440,981 shares of his Livewire stock as security for any future damages claims Livewire might have in connection with future breaches of the Merger Agreements by Dujardin. The Pledge Agreement also contained a provision requiring Livewire to release the pledged shares in the event Dujardin was terminated without cause.

After his termination, Dujardin demanded that Livewire deliver to him all of the pledged shares and the Earnout shares that were unpaid, on the ground that he had not been terminated for cause. Livewire refused to deliver the shares, asserting that Dujardin had been terminated for cause. Dujardin commenced an arbitration proceeding in connection with the pledged shares in accordance with the Pledge Agreement, Section 14 of which required the parties to arbitrate disputes relating to the agreement. Dujardin did not seek to arbitrate his claim of entitlement to the Earnout shares; rather, his claim regarding those shares is asserted in Count V of the instant Complaint.

The arbitration proceeding claim resulted in a determination that Dujardin was entitled to the pledged shares because he had not, in fact, been terminated for cause. The parties agree that the arbitrator's determination as to the basis of Dujardin's termination is binding as to the Earnout claim at issue here and Defendants therefore concede their liability on the claim asserted in Count V of the Complaint.

---

9. There were originally 117,595 Earnout shares held back from Dujardin, but 28,787 of those shares were subsequently delivered to Dujardin. The parties agree that only 88,808 of the Earnout shares are still at issue.

The arbitrator went on to determine the cash value of the improperly withheld pledged shares. The parties disagree as to whether they (and, thus, this Court) are bound by the valuation methodology applied by the arbitrator with respect to the pledged shares insofar as Dujardin seeks cash damages in respect of the improperly withheld Earnout shares. The Court finds that the arbitrator's decision as to the value of the pledged shares is not determinative of the value of the Earnout shares.

 "Under New York law, '[t]he doctrine of collateral estoppel [bars] a party from relitigating an issue which has previously been decided against him in a proceeding in which he had a fair opportunity to fully litigate the point.'" *Khandhar v. Elfenbein*, 943 F.2d 244, 247 (2d Cir.1991) (quoting *Kaufman v. Eli Lilly & Co.*, 65 N.Y.2d 449, 455, 492 N.Y.S.2d 584, 482 N.E.2d 63 (1985) (internal quotation marks and citation omitted)). It is well settled that collateral estoppel, or issue preclusion, applies to issues resolved by a prior arbitration. *Khandhar*, 943 F.2d at 247. For the doctrine to apply, "'[f]irst, the identical issue necessarily must have been decided in the prior action and be decisive of the present action, and second, the party to be precluded from relitigating the issue must have had a full and fair opportunity to contest the prior determination.'" *Id.* (quoting *Kaufman*, 65 N.Y.2d at 455, 492 N.Y.S.2d 584, 482 N.E.2d 63). The party invoking the doctrine bears the burden of establishing the identity of the issues. *Id.*

 Here, Dujardin has not satisfied his burden of establishing that the damages issue decided by the Arbitrator was identical to the issue presented in the case at bar. Defendant has proffered evidence to indicate that a key component of the formula adopted by the Arbitrator in valuing the 440,981 pledged shares was a percentage discount (35%) for marketability and blockage that was arrived at in part based on "the volume of shares concerned relative to the average daily trading volume in the stock." (Arbitrator's Opinion and Award, Picon Decl., Exh I at 26.) Thus, the imposition of a 35% discount was influenced by the fact that the block of shares at issue before the Arbitrator numbered 440,981. In the case at bar, the number of Earnout shares at issue—88,808—is substantially different than the number of shares that were at issue before the Arbitrator, possibly warranting the use of a different discount factor. Thus, the issue before the Court is not identical to the issue decided by the Arbitrator. The parties therefore are not estopped from litigating the value of the Earnout shares owed to Dujardin.

Accordingly, Plaintiff's motion for summary judgment is granted to the extent that the Court finds that Defendant Livewire is liable for breach of the Earnout provision of the Merger Agreements, as alleged in Count V of the Complaint, but is denied to the extent it seeks a determination as to damages based on the collateral estoppel effect of the Arbitrator's ruling.

*Defendants' Motion for the Imposition of Sanctions Pursuant to Fed.R.Civ.P. 11*

Defendants move pursuant to Fed.R.Civ.P. 11 for the imposition of sanctions upon Dujardin and his attorneys, Proskauer Rose LLP, for allegedly filing a complaint without first conducting a reasonable investigation. Defendants seek to strike Counts I and II from the Complaint in their entirety, as well as certain portions of Counts III and IV and certain other paragraphs of the Complaint. Defendants also seek an award of reasonable attorneys' fees and expenses incurred in connection with the instant motion and defending against the purportedly offending allegations. Plaintiff opposes the motion

and seeks reasonable attorneys' fees and expenses incurred in defending the instant motion.

Defendants' motion revolves around two principal contentions: (1) that there was no reasonable basis for the allegations in the Verified Complaint regarding the allegedly concealed transactions when the material terms of those transactions were disclosed in various public filings, and (2) that Proskauer and Dujardin deliberately omitted crucial facts concerning the date on which Plaintiff became aware that he would not be made head of Livewire's Network Division, thus misleadingly pleading compliance with the one-year statute of limitations for securities fraud claims brought under Section 10(b) and 10b–5.

A Rule 11 violation occurs " 'when it appears that a pleading has been interposed for any improper purpose, *or where*, after reasonable inquiry, a competent attorney could not form a reasonable belief that the pleading is well grounded in fact and is warranted by existing law or a good faith argument for the extension, modification or reversal of existing law.' " *Greenberg v. Chrust*, 297 F.Supp.2d 699, 703 (S.D.N.Y.2004) (quoting *Eastway Constr. Corp. v. City of New York*, 762 F.2d 243, 254 (2d Cir.1985) (emphasis in original)). "Rule 11 sanctions are appropriate 'where it is patently clear that a claim has absolutely no chance of success under the existing precedents, and where no reasonable argument can be advanced to extend, modify or reverse the law as it stands....' " *Katzman v. Victoria's Secret Catalogue*, 167 F.R.D. 649, 659–61 (S.D.N.Y.1996) (quoting *Eastway*, 762 F.2d at 254). The test is whether the attorney's conduct was objectively reasonable at the time the pleading was signed. *Greenberg*, 297 F.Supp.2d at 703. Sanctions should "be imposed carefully lest they chill the

creativity essential to the evolution of the law." *Id.*

Here, it cannot be said that it was patently clear that Dujardin's claims had absolutely no chance of success, or that Proskauer's conduct was objectively unreasonable. While the Court has determined that the various public filings did contain information sufficient for Plaintiff to have discovered the allegedly concealed below-market related-party transactions that were the basis of the alleged fraudulent scheme, and that such filings were not presented in a manner likely to mislead a reasonable investor, the Court cannot conclude that the arguments of Plaintiff's counsel to the contrary are so ill-conceived and devoid of a basis in fact that they warrant the imposition of Rule 11 sanctions. As to Defendants' contentions regarding the date in which Dujardin discovered that he would not be made head of the Network Division, the evidence proffered by Defendants demonstrates that there is a material issue of fact as to when the alleged fraud was discovered, but is insufficient to warrant the conclusion that Plaintiff and Proskauer did not have a reasonable belief that the pleading was well-grounded in fact. Therefore, Defendants' motion for sanctions pursuant to Rule 11 is denied, as is their corresponding request for attorneys' fees and expenses.

Plaintiff moves for an award of reasonable attorneys' fees and expenses incurred in connection with its defense against Defendants' motion for sanctions pursuant to Rule 11(c)(1)(A) on the grounds that Defendants' motion was filed for the improper purposes of harassment and trying to bolster a meritless application. "If warranted, the Court may award the party prevailing on the motion [for sanctions] the reasonable expenses and attorney's fees incurred in presenting or opposing the mo-

tion." Fed.R.Civ.P. 11(c)(1)(A). The Court concludes that Defendants' motion was not clearly frivolous and therefore an award of attorneys' fees is not warranted. Plaintiff's application for attorneys' fees and expenses therefore is denied.

## CONCLUSION

For the foregoing reasons, Defendants' motion to dismiss is granted with prejudice as to Counts I and III of the Complaint with respect to Plaintiff's fraud claims concerning the alleged scheme involving the below-market related-party transactions, and is granted without prejudice as to Counts I and III with respect to Plaintiff's fraud claims concerning the alleged promise to appoint Plaintiff head of Livewire's Network's Division. Defendant's motion to dismiss is granted with prejudice as to Count II of the Complaint with respect to Plaintiff's claim under Section 20(a) of the Securities Exchange Act concerning Defendants' alleged scheme involving the below-market related-party transactions, and is granted without prejudice as to Count II with respect to Plaintiff's claim under Section 20(a) of the Securities Exchange Act concerning Defendants' alleged promise to appoint Plaintiff head of Livewire's Network Division. Defendants' motion to dismiss is granted with prejudice as to Counts IV and VI of the Complaint, and is denied as to Count V.

Plaintiff's motion for summary judgment as to Count V of the Complaint is granted to the extent it seeks a determination that Livewire is liable for improperly withholding the Earnout shares and is denied in all other respects. Defendants' motion for Rule 11 sanctions and attorneys' fees is denied. Plaintiff's request for expenses and attorneys' fees in connection with its opposition to Defendants' sanctions is also denied.

Plaintiff may, within twenty-one (21) days of the date hereof, file and serve an amended complaint augmenting his fraud claims regarding the denial of the promotion to division head with additional facts concerning the appointment of Davis to the position. If such a timely amendment is not made, Counts I, II and III will be dismissed with prejudice in their entirety, without further notice to Plaintiff.

The parties shall arrange promptly to meet with Magistrate Judge Freeman for settlement purposes and to attend to any further pretrial matters in the event that the remaining claims are not settled.

IT IS SO ORDERED.